IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

INTERNATIONAL MARINE       )
INDUSTRIAL APPLICATORS, INC.,  )
                         )
     Plaintiff,          )     Case No. MJG-02CV-3542
                         )
     v.                )
                         )
UNITED STATES OF AMERICA, *et al.*)
                         )
     Defendants.        )
_____)

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO THE
MOTION TO DISMISS OF DEFENDANT HELLER FINANCIAL, INC.**

**I.**     **Introduction.**

     In its Complaint, IMIA has alleged sufficient facts to give rise to actions based upon constructive trust, unjust enrichment, and maritime and equitable liens against Defendant Heller Financial, Inc. ("Heller") as a result of Heller's conversion of the proceeds of IMIA's Request for Change Order in the amount of $2,181,398.12 which was paid by the USA to BMI.

     It is unclear to IMIA how Heller came to be in possession of all or part of the Change Order Request proceeds once they were paid to BMI by USA.  Heller has filed with this Court its Motion to Dismiss IMIA's claims against it, arguing that under Maryland law, IMIA has failed to allege sufficient facts to support a constructive trust claim against Heller.  Heller further argues that all of IMIA's legal and/or equitable lien

759862.1 4/7/03

theories are without merit and therefore, are due to be dismissed. Notwithstanding Heller's arguments in support of its Motion to Dismiss, IMIA will demonstrate that IMIA has sufficiently alleged facts in its First and proposed Second Amended Complaint that state a cause of action for constructive trust, and equitable and maritime lien theories to support recovery of the funds held by Defendant, Heller.

The Court has yet to grant IMIA leave to file its proposed Second Amended Complaint and Defendant Heller's Rule 12(b)(6) Motion seeks dismissal of IMIA's proposed Second Amended Complaint. In the alternative, if the Court for some reason does not grant IMIA leave to file its proposed Second Amended Complaint, Heller has requested that this Court construe its Rule 12(b)(6) Motion against IMIA's First Amended Complaint. The only material difference between IMIA's First Amended Complaint and proposed Second Amended Complaint is that IMIA's proposed Second Amended Complaint includes a Seventh Cause of Action for an Equitable Lien against BMI and Heller. The factual allegations, however, are identical. Therefore, if the facts, as alleged in IMIA's First Amended Complaint state a cause of action against Heller, then the proposed Second Amended Complaint does, as well.

## II.    IMIA Need Only Meet the Notice Pleading Requirements to Survive a Motion to Dismiss.

The Federal Rules of Civil Procedure do not require IMIA to set out in *detail* the facts upon which IMIA bases its claim. To the contrary, all the Rules require is a 'short and plain statement of the claim' that will give the Defendant fair notice of what the Plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41,

47 (1957). "[T]he accepted rule [is] that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45-46. (citations omitted). Nonetheless, "a plaintiff is not charged with 'forecast[ing] evidence sufficient to prove an element' of her claim, *Bass v. E.I. du Pont de Nemours & Co.*, 2003 WL 1558201, *3 (4th Cir. 2003) (quoting, *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002), but need only *allege* facts that support a claim for relief." *Bass*, 2003 WL 1558201 at *3. (Emphasis added.) Furthermore, "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Conley*, 355 U.S. at 48. Based on these well-established principles and for the reasons discussed in further detail below, Heller's Motion to Dismiss is due to be denied.

## III.    IMIA Has Sufficiently Alleged a Cause of Action Against Heller for a Constructive Trust.

The Maryland Court of Appeals in *Wimmer v. Wimmer*, 414 A.2d 1254 (1980), explained the purpose and scope of a constructive trust:

> A constructive trust is the remedy employed by a court of equity to convert the holder of the legal title to property into a trustee for one who in good conscience should reap the benefits of the possession of said property. The remedy is applied by operation of law where property has been acquired by fraud, misrepresentation, or other improper method, or whether circumstances render it inequitable for the party holding the title to retain it. [Citations omitted.] The purpose

> of the remedy is to prevent the unjust enrichment of the
> holder of the property.

*Wimmer*, 414 A.2d at 1258.

IMIA, with the full knowledge, consent and authority of the Defendant, United States of America ("USA") entered into a Subcontract Agreement to perform services on the RESOLUTE (AFDM-10) at the request of Defendant, Baltimore Marine Industries ("BMI"). (First Amended Complaint, ¶ 8; proposed Second Amended Complaint, ¶ 8.) In performance of its Subcontract, IMIA performed repairs and maintenance on the RESOLUTE which included staging, surface preparation, coating and cleaning. (First Amended Complaint, ¶ 10; proposed Second Amended Complaint, ¶ 10.) Upon completion of its services on the RESOLUTE, IMIA submitted to USA through BMI its Change Order Request in the amount of $2,181,398.12 for additional work and changes on the RESOLUTE beyond the scope of IMIA's original Purchase Order. (First Amended Complaint, ¶ 13; proposed Second Amended Complaint, ¶ 13.) IMIA's Change Order sought payment for direct job costs only, and did not include claims for unliquidated amounts. *Id*. Furthermore, when BMI forwarded IMIA's Change Order Request to USA, BMI added thereto its own request for additional sums, the exact nature and amount of which are unknown to IMIA. *Id*.

In October of 2002, BMI negotiated an agreement with USA for amounts which included IMIA's Change Order Request. (First Amended Complaint, ¶ 16; proposed Second Amended Complaint, ¶ 16.) It was only through collateral sources that IMIA learned that USA had paid BMI. *Id*. Thus, BMI concealed the fact of the payment and

the details thereof from IMIA. *Id*. BMI's actions were in direct contradiction to BMI's repeated promises made to IMIA that it would be kept informed of the progress of negotiations with USA and that BMI would consult with IMIA prior to entering into any agreement with USA. *Id*. More importantly, IMIA was informed and believes and has alleged in its Complaint that the payment from USA to BMI for IMIA's work was based upon the representations by BMI to USA that, upon receipt of payment from USA, it would immediately deliver those sums belonging to IMIA. (First Amended Complaint, ¶ 17; proposed Second Amended Complaint, ¶ 17). This fact is buttressed by a letter from the Navy Contracting Officer addressed to BMI which states in pertinent part:

> As I am sure you are aware of, Baltimore Marine Industries ("BMI") settled its claim, **partly on behalf of IMIA**, and has been paid the agreed settlement amount. The settlement was **fully intended by the Parties to the settlement to cover the subcontract claim of IMIA**, which Mr. Kelly is complaining about.

(Emphasis supplied.) A true and correct copy of the Contracting Officer's letter is attached hereto as Exhibit 1A to the Affidavit of James A. Kelley. As a result, BMI acquired IMIA's portion of the Change Order Request proceeds in direct violation of its Agreement with both USA and IMIA. *See, Wimmer*, 414 A.2d at 1258 (1980). IMIA had a good equitable claim of entitlement to the Change Order Request proceeds resulting from IMIA's expenditure of funds, labor, and material. IMIA relied, to its detriment, upon BMI's repeated promises that it would deliver the proceeds to IMIA, resulting in the unjust enrichment of BMI and Heller. *See, Id*. IMIA is not aware how Heller came to be in possession of all or part of the Change Order Request Proceeds once

759862.1 4/7/03

5

USA paid them over to BMI.  Nevertheless, Heller has admitted that it is currently in possession of some or all of the Change Order Request proceeds.  See, Heller's Mem. In Supp. of its Motion to Dismiss, p. 10, ¶ 2.

The facts in IMIA's First and proposed Second Amended Complaint clearly allege that BMI "acquired by fraud, misrepresentation, or other improper methods" the proceeds from IMIA's Change Order Request.  *Wimmer*, 414 A.2d at 1258.  Therefore, this Court is entitled to "employ a constructive remedy converting the holder of legal title to the Change Order proceeds into a trustee [for IMIA] who in good conscience should reap the benefits of the possession of said property."  *Dulany v. Taylor*, 668 A.2d 1046, 1054 (Ct. Spec. App. 1995) (quoting *Wimmer*, 414 A.2d at 1258).

Heller incorrectly cites *Dulany v. Taylor*, 660 A.2d 1046, 1054 (Ct. Spec. App. 1995), for the proposition that "where party fails to show that it 'would be inequitable for [party in possession of money] to retain this money,' constructive trust claim must be denied."  (Heller's Mem. In Supp. of its Motion to Dismiss, p. 6).  The quote from *Dulany*, put in its proper context should read as follows:

> First of all, the money here at issue was not acquired by the Meredith Estate by fraud, misrepresentation, or other improper methods.  At all times here relevant, the monies at issue belong to the Estate.  Second, there was no evidence prevented showing that it would be inequitable for the Estate to retain this money.  Appellees did not, in any sense, *earn* the money and therefore there is no element of unjust enrichment.

*Dulany*, 660 A.2d at 1054 (Emphasis added).  Contrary to the situation in *Dulany*, in the instant case IMIA has clearly alleged sufficient facts that demonstrate that in every sense, it had earned and was entitled to receive the proceeds from its Change Order Request.

In addition to the reasons cited above for imposing a constructive trust, the Court of Appeals of Maryland in *Carter v. Abramo*, 93 A. 2d 546, 548 (Md. 1953) stated:

> [W]here property is conveyed to a person upon his oral promise to hold it and later reconvey it to others, and at the time of the conveyance he stands in a confidential relation to the others, a court of equity will not allow him to keep the property and be unjustly enriched, but will compel him to transfer the title to the parties equitably entitled to it, even though he may have intended at the time of the conveyance to carry out the agreement, and even though he was not guilty of fraud, undue influence, or any other abuse of the confidential relation in procuring the conveyance.  A confidential relation exists in cases . . . wherever confidence is reposed by one person and accepted by another.

*Carter v. Abramo*, 93 A.2d at 548 (citing, *Grimes v. Grimes*, 40 A. 2d 58; *Rice v. Rice*, 41 A.2d 371).  IMIA has alleged in its First and proposed Second Amended Complaint that BMI had made repeated promises to both USA and IMIA that BMI would convey the proceeds of IMIA's Change Order that BMI submitted to USA on IMIA's behalf to IMIA when USA made final payment to BMI.  Furthermore, BMI was the prime contractor on the RESOLUTE project and IMIA was a subcontractor.  Thus, IMIA was dependent upon BMI to use its influence and control as prime contractor to submit its Change Order Request to USA.  IMIA was further dependent upon BMI's assurances that it would deliver to IMIA the proceeds of its Change Order Request once it received payment from USA.

759862.1 4/7/03

The relationship between IMIA and BMI was of a confidential or fiduciary nature as BMI exercised influence and control with respect to the submission and payment of IMIA's Change Order Request to USA.  IMIA reposed trust and confidence in BMI that it would stick to its word that it would pay the proceeds due and owing to IMIA. See, *Wenger v. Rosinsky*, 192 A. 2d 82, 86-87 (Md. 1963) ("whenever there is a confidential or fiduciary relation between two parties wherein trust and confidence are reposed on one side and influence and control are exercised on the other, a court of equity will interpose on the ground of public policy to prevent the weaker party from stripping himself of his property.").

Therefore, when USA paid the Change Order Request proceeds over to BMI, a constructive trust arose upon the proceeds in favor of IMIA.  Although BMI may have subsequently turned the funds over to Defendant, Heller, IMIA is entitled to trace the proceeds from the hands of BMI to those of Heller.  The underlying result is that Heller's alleged security interest **never attached** to the Change Order Request Proceeds because these proceeds were never in any way the property of BMI.  See, *Pearlman v. Reliance Ins. Co.*, 372 U.S. 132, 136 (1962) (where subcontractor has equitable interest in funds, any property interest asserted by other parties in said funds does not attach.)  BMI was to serve as a mere conduit for IMIA to receive payment for the services that it rendered on the RESOLUTE from USA.  (First Amended Complaint, ¶¶ 16-20, 31-33; proposed Second Amended Complaint ¶¶ 16-20, 31-33).

As evidenced by IMIA's First and proposed Second Amended Complaints and the letter from the Navy Contracting Officer addressed to BMI, see Exhibit 1A, the Change Order Request proceeds never belonged to BMI and were to be properly paid over to IMIA. Therefore, Heller's alleged security interest never attached to said proceeds since they never properly belonged to BMI as BMI was a fiduciary/trustee acting for the sole benefit of IMIA.

Heller cites *National Union Fire Ins. Co. of Pittsburgh, PA. v. The United States Terre Haute First National Bank*, 304 F.2d 465 (Ct. Cl. 1962) for the incorrect proposition that Heller would not be unjustly enriched if it were permitted to retain the Change Order proceeds. The facts and conclusions of *National Union Fire*, are clearly distinguishable from those of the instant case. In the latter case, the Plaintiff brought suit against the defendant assignee bank seeking to recover a progress payment made under a Government contract, plus the amount remaining due and payable from the United States on the contract. *National Union Fire*, 304 F.2d at 465. The plaintiff was a surety demanding payment of a contract fund due before default by the contractor and before any money had been paid out by the surety. *Id.* at 468. Because the surety sought to recover a progress payment made by the Government to the assignee bank before the contractor had defaulted on the contract and before the surety had made any payments under its performance bond, the Court held that the plaintiff surety was not entitled to recover the progress payment made to the assignee bank. *Id.* at 468.

Unlike *National Union Fire*, no surety is involved in the instant case, and IMIA is not seeking to recover progress payments made by USA to BMI. The payment made by USA to BMI was in payment for the work performed by IMIA and BMI on the RESOLUTE. Because the plaintiff in *National Union Fire* sought to recover a progress payment paid by the Government to the assignee bank before the contractor had defaulted and before the surety had made any payment on its performance bond, the Court correctly held that the defendant bank would not be unjustly enriched if permitted to retain the funds. On the other hand, the facts in IMIA's First and proposed Second Amended Complaint sufficiently allege that Heller would be unjustly enriched if it were permitted to retain the Change Order proceeds that belong to IMIA and which BMI repeatedly promised both USA and IMIA that it would deliver to IMIA. Moreover, *National Union Fire* is further distinguishable in that it was a case decided by the United States Court of Claims construing federal law. IMIA's claim of a constructive trust is based upon state law. Also, the facts in IMIA's First and proposed Second Amended Complaint raise a material issue as to whether Heller's alleged security interest ever attached to the Change Order proceeds held by USA and paid over to BMI and/or Heller.

Heller next incorrectly argues that IMIA's proposed Second Amended Complaint is devoid of any allegation that could conceivably support a constructive trust claim against Heller because IMIA has failed to allege that Heller "(a) perpetrated a fraud, (b) exerted any duress or undue influence, (c) received the monies by mistake, or (d) committed any breach of fiduciary duty prior to receiving the proceeds of its collateral."

(Heller's Mem. In Supp. of its Motion to Dismiss) (quoting *Dulany*, 105 Md. App. at 635 ("because there was no evidence that the Estate was a 'wrongdoer' there is no reason why equity should 'wrest' the money from the possession of the Estate")).  It is not necessary for IMIA to allege any "wrongdoing" on the part of Heller in order to allege a constructive trust claim against the proceeds in Heller's possession.  As discussed *supra*, a constructive trust is "applied by operation of law where property has been acquired by fraud, misrepresentation, or other improper method, *or where circumstances render it inequitable for the party holding the title to retain it*."  *Starleper v. Hamilton*, 666 A.2d 867, 869 (Ct. Spec. App. 1995) (quoting *Wimmer*, 414 A.2d at 1254).[1]  As the *Starleper* court explained, "*Wimmer* makes clear . . . that imposition of such a trust is not necessarily dependent on a finding that the person whose property is subjected to it has committed some impropriety, but may rest as well upon a finding of unjust enrichment arising from other circumstances that 'render it inequitable for the party holding the title to retain it.'"  *Starleper*, 666 A.2d at 869-870 (quoting, *Wimmer*, 414 A.2d at 1254).  Thus, "wrongdoing on [Heller's] part is not a necessary pre-condition."  *Starleper*, 666

---

[1]  While confusing, Heller asserts that "[i]t is therefore academic whether IMIA held a maritime or Maryland statutory or equitable lien since Heller committed no wrong prior to receiving the proceeds of its collateral that it was entitled to receive."  (Heller's Mem. In Supp. of its Motion to Dismiss, p. 9.)  Based upon the *Wimmer* and *Starleperi* cases, the fact that Heller may have committed no wrong prior to taking possession of IMIA's Request for Change Order proceeds is irrelevant.  More importantly, it is far from academic whether IMIA possesses maritime or equitable liens upon the proceeds currently in the hands of Heller.  Whether or not IMIA possesses any federal liens has no bearing on whether or not IMIA has a cause of action under Maryland law for a constructive trust upon the proceeds currently in the hands of Heller and/or BMI.  While constructive trusts and equitable liens are both based upon equitable principles, Defendant Heller has cited no precedent that holds that in order to establish a constructive trust under Maryland law a party must first establish entitlement to an equitable lien.

A.2d at 871.  Based upon the foregoing, IMIA is not required to allege any type of wrongdoing on the part of Heller in order to support its constructive trust cause of action.

"Because a constructive trust is an equitable remedy, the court must consider all of the relevant circumstances in deciding whether it is an appropriate remedy in a given case." *Starleper*, 666 A.2d at 870.  Considering all of the relevant circumstances, IMIA has alleged facts that support its constructive trust cause of action against Heller. Accordingly, Heller's Motion to Dismiss IMIA's Fourth Cause of Action is due to be denied.

**IV.    IMIA's Maritime Lien Takes Priority Over Heller's Alleged Security Interest in the Change Order Proceeds**.

Heller relies essentially upon the United States' Motion and reply Memorandum in Support of its Motion to Dismiss IMIA's maritime lien claim as support for Heller's position that the Maritime Commercial Instruments and Lien Act ("MCILA") expressly bars maritime liens on public vessels and therefore any maritime lien theory asserted by IMIA must fail.  IMIA contends that it possesses a maritime lien on the Change Order Request proceeds paid over by USA to BMI and/or Heller pursuant to 46 U.S.C.A. Section 31342, based upon the *in personam* provisions of the Suits in Admiralty Act, 46 App. U.S.C.A. §§ 741-752 (2002 Supp.).   By reference, IMIA incorporates its Memorandum in Response to the United States' Motion to Dismiss as if fully set forth herein as its argument in support of its cause of action for a maritime lien against Heller.

Several cases have held that valid maritime liens under MCLIA, 46 U.S.C.A. § § 31301-31343, have priority over a perfected Uniform Commercial Code security

interest.   Valid maritime liens under 46 U.S.C.A. § 31342(a), have priority over a

perfected Uniform Commercial Code security interest.  *Matter of Topgallant Lines, Inc.*,

154 B.R. 368 (S.D. Ga. 1993), *aff'd without published opinion*, 20 F.3d 1175 (11th Cir.

1994), *rehearing and suggestion for rehearing en banc denied*, 49 F.3d 734 (11th Cir.

1995).   MCLIA automatically gives rise to a maritime lien when a person furnishes

necessaries to a vessel, the court explained, and neither intent nor consent is involved in

the lien's formation.  *Id.* at 376.  Moreover, the scope of Maryland's version of Article

Nine makes the UCC inapplicable to a security interest subject to any statute of the

United States.  Maryland Code Section 9-109(c)(1) states that Maryland's Article Nine

does not apply to the extent that "[a] statute, regulation, or treaty of the United States

preempts this title."  MD. CODE ANN., COM. LAW IX § 9-109 (1999).  Maryland Code Section

9-311 further states "the filing of a financing statement is not necessary or effective to

perfect a security interest in property subject to a statute, regulation or treaty of the

United States whose requirements for a security interest's obtain priority over the rights

of a lien creditor with respect to the property preempt § 9-310(a)."  MD. CODE ANN., COM.

LAW IX § 9-311 (1999).  MCILA preempts Maryland's Article Nine.

     Because maritime liens prevail over non-maritime claims, Heller's alleged UCC

security interest is subordinate to IMIA's valid maritime lien on the RESOLUTE and its

freights.  *In re Topgallant Lines,* 154 B.R. at 376; *see also, United Shipping Services

Three, Inc. v. U.S. Express Lines, Ltd.*, No. CIV. A. 98-950, 1998 WL 770599 (E.D. Pa.

Nov. 5, 1998) (maritime lien will have priority over security interest perfected under

UCC Article 9, *citing*, *The J.E. RUMBELL*, 148 U.S. 1 (1893) (maritime lien had priority in admiralty over a mortgage encumbering a ship)); *Western Bolt Carriers (Australia) Pty., Ltd. v. P.S. International, Inc.,* 164 B.R. 616, 619-622 (S.D. Ind., 1994) (maritime lien has priority over all non-maritime claims, including perfected UCC security interests).

Heller also argues that, assuming that IMIA has the right to proceed against the United States to obtain an *in personam* judgment, that does not mean that IMIA ever had a maritime lien on the general public funds that the United States used to pay BMI which have now been paid in all or part to Heller. (Heller's Mem. In Supp. of its Motion to Dismiss, p. 10). Heller's assertion that the funds in the hands of the United States were "unencumbered general public funds" ignores IMIA's causes of action that directly assert maritime lien, equitable lien, and constructive trust on the "unencumbered" funds in the hands of the United States which were specifically identified as being due and owing for services performed on the RESOLUTE. Based on IMIA's equitable and statutory theories of recovery, IMIA seeks to trace the funds paid by USA which are now in the hands of BMI and/or Heller.[2]

---

[2]  Heller cites *American Fidelity Co. v. National City Bank of Evansville*, 266 F.2d 910, 915-16 (D.C. Cir. 1959) for the conclusion that IMIA does not have any right to be paid the monies that Heller has now received. First, Heller fails to recognize that IMIA's maritime lien takes priority over any alleged Article Nine security interest Heller may have. See, *supra*., section IV. Second, *American Fidelity* is distinguishable from the instant case for the same reasons that *National Union Fire*, cited by Heller *supra*., Section III. *American Fidelity* was a case where a surety on a Government construction contract sought reimbursement of sums paid out by it by suing the assignee bank for progress payment collected by the bank prior to the contractor's default. In the instant suit, there is no surety and the payment made by USA was not

**V.    IMIA Possesses an Equitable Lien Upon the Change Order Proceeds Now in the Hands of BMI and/or Heller.**

The equitable rights of unpaid subcontractors to construction balances are long-recognized by decisions of the United States Supreme Court.    In *Henningsen v. United States Fidelity & Guar. Co.*, 208 U.S. 404, 410 (1908), the Supreme Court stated that the Government had "equitable obligations to see that the laborers and supply men were paid."  The Supreme Court reaffirmed that recognition in *Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 141 (1962), stating that "laborers and material men had a right to be paid out of the fund."   IMIA, an unpaid federal subcontractor, seeks to declare and enforce such equitable rights against Heller.  For years, the federal courts have permitted sureties on government contracts to enforce related rights.  Thus, in *Pearlman*, the Court upheld a surety's right to reimbursement from remaining contract monies, reasoning that the surety, having paid the laborers and material men, was entitled to the benefit of the rights of the persons it paid.  *Pearlman*, 371 U.S. at 141.  Therefore, if the surety's right to reimbursement rests on the rights of the subcontractors it paid, it stands to reason that the subcontractors themselves should be able to assert those rights where there is no surety.  IMIA was a federal subcontractor who with the full knowledge of consent of

---

a progress payment, but was a final payment for services performed upon the RESOLUTE which BMI had specifically and repeatedly promised both USA and IMIA that it would pay the Request for Change Order Proceeds directly over to IMIA.  Further, Heller  has offered no case law to demonstrate that under the facts alleged in IMIA's First and proposed Second Amended Complaints, Heller's alleged security interest even attached to the proceeds held by USA  where repeated promises were made by BMI that it would pay IMIA's Request for Change Order Proceeds to IMIA.  See, Exhibit 1A; First Amended Complaint, ¶¶14-20, 31-33; proposed Second Amended Complaint, ¶¶14-20; 31-33.

759862.1 4/7/03                                                    15

USA performed repairs and maintenance on the vessel RESOLUTE with all of said work being accepted by USA. (First Amended Complaint, ¶ 10; proposed Second Amended Complaint ¶ 10). At all times material, before, during and after the rendition of such services by IMIA, Defendant USA was aware that IMIA would be rendering such services and that IMIA was relying upon the credit of the RESOLUTE for payment. (First Amended Complaint ¶ 12; proposed Second Amended Complaint ¶ 12). Upon completion of its services on the RESOLUTE, IMIA submitted to USA, through BMI, its Change Order Request in the amount of $2,181,398.12 for increased work and changes on the RESOLUTE, beyond the scope of IMIA's original Purchase Order. (First Amended Complaint ¶ 13; proposed Second Amended Complaint ¶ 13). Furthermore, it is IMIA's belief that BMI added its own pay requests to IMIA's Change Order Request submitted to USA. *Id*. More importantly, upon information and belief, USA paid BMI the funds from IMIA's Change Order Request based upon representations by BMI to USA that upon receipt of payment from USA, BMI would immediately deliver the change Order Request proceeds to IMIA. (First Amended Complaint ¶ 17; proposed Second Amended Complaint ¶ 17). Based upon BMI's representations to USA, USA delivered the sums to BMI to which IMIA was entitled for its Change Order Request on the RESOLUTE notwithstanding the fact that BMI and USA were aware of IMIA's entitlement to receive these funds to which BMI has refused to pay. (First Amended Complaint ¶ 18; proposed Second Amended Complaint ¶ 18). As a result of the services rendered upon the RESOLUTE by IMIA, with the full consent and knowledge of BMI

and USA, IMIA is entitled to an equitable interest or equitable lien on the proceeds paid by USA to BMI for services rendered upon the RESOLUTE which included IMIA's Change Order Request.     *See, Universal Bonding Ins. Co. v. Gittens & Sprinkle Enterprises, Inc.*, 960 F.2d 366, 375-377 (3rd Cir. 1992) (once funds are received by prime contractor, they will constitute an equitable trust for the benefit of laborers and material men.  Because laborers and material men retain equitable interest in the funds paid to the prime contractor by the Government, they may enforce their interest in the funds); *Matter of RAH Development Co., Inc.*, 184 B.R,. 525, 535-538 (Bankr. W.D. Mich. 1995 (subcontractor entitled to equitable lien upon funds in the hands of bankruptcy trustee)).

IMIA's rights in the funds or proceeds paid by USA to BMI are superior to those of BMI.  *U.S. v. TAC Const. Co., Inc.*, 760 F.Supp. 590, 593 (S.D. Miss. 1991). Moreover, IMIA's equitable interest in the proceeds once they were paid over to BMI were superior to any security interest held by Heller.  *Id*. at 594.  *See also, Active Fire Sprinkler Corp. v. United States Postal Service*, 811 F.2d 747, 755-56 (2nd Cir. 1987) (sureties, who had compensated the unpaid laborers and suppliers, had claims to the unpaid contract balances superior to the claims of bankruptcy estates and creditors.); *In re Pyramid Industries, Inc.*, 210 B.R. 445, 448 (N.D. Ill. 1997), *rev'd on other grounds, U.S. v. Maxwell*, 157 F.3d 1099 (7th Cir. 1998) (unpaid subcontractors take priority over secured creditors).

In its Memorandum in Support of its Motion to Dismiss, Heller mistakenly cites to several Maryland state cases construing equitable lien law according to Maryland law. Heller further engages in an analysis of these cases and applies the Maryland state equitable lien principles to the facts of this case. IMIA offers no response to Heller's equitable lien arguments in light of the fact that the law of equitable liens under Maryland state law is entirely irrelevant to IMIA's cause of action for an equitable lien against Heller since IMIA's cause of action is controlled by federal law.[3]

IMIA has made the requisite showing of facts in its First and proposed Second Amended Complaint to successfully allege a cause of action against Defendant Heller for an equitable lien on the proceeds now in the hands of BMI and/or Heller. Therefore, Heller's Motion to Dismiss is due to be denied.

---

[3] Assuming for the sake or argument that state lien law applies, it is preempted by federal law. *See e.g,. State of Montana v. United States*, 124 F.3d 1269, 1274 (Fed. Cir. 1997); *Aurora Maritime Co. v. Abdullah Mohamed Fahem & Co.*, 85 F.2d 44 (2d Cir. 1996).

**VI.    <u>IMIA's Sixth Cause of Action for a Maryland State Law Boat Lien</u>.**

Upon review, IMIA concedes that its Sixth Cause of Action for a lien pursuant to § 16-202(b) of the Maryland Code annotated, Commercial Law Article in both its First and proposed Second Amended Complaint cannot be maintained and therefore withdraws is Sixth Cause of Action against BMI and Heller.


_____/s/_____
Edward J. Baines, (Bar No. 06776)


_____/s/_____
Patrick E. Clark (Bar No. 26628)
Saul Ewing LLP
100 South Charles St., 16th Floor
Baltimore, Maryland 21201-2773
(410) 332-8600
(410) 332-8185 (fax)

Attorneys for Plaintiff

OF COUNSEL:
I. David Cherniak, Federal Bar No. CHERI8107
Lawrence J. Seiter, Federal Bar No. SEITL4720
Johnstone, Adams, Bailey, Gordon and Harris, LLC
P. O. Box 1988
Mobile, Alabama 36633
Tel.:  (251/432-7682)
Fax: (251/432-0712)