IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

| | |
|---|---|
| INTERNATIONAL MARINE & INDUSTRIAL APPLICATORS, INC., an Alabama Corporation, </br></br>    Plaintiff, </br></br>  v. </br></br>UNITED STATES OF AMERICA, and </br></br>BALTIMORE MARINE INDUSTRIES, INC., and </br></br>HELLER FINANCIAL, INC. </br></br>    Defendants. | ) ) ) ) ) ) )   Case No. MJG-02CV-3542 ) ) ) ) ) ) ) ) ) |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF
MOTION BY HELLER FINANCIAL, INC.
TO DISMISS THE SECOND AMENDED COMPLAINT**

**Preliminary Statement**

Heller Financial, Inc. ("Heller") initially directed this motion at the Second Amended Complaint of International Marine & Industrial Applicators, Inc. ("IMIA") with the expectation that the Court would shortly be granting IMIA's motion for leave to file that pleading. Heller alternatively requested for this motion to be directed at IMIA's First Amended Complaint, if IMIA's motion to amend were to be denied. In its opposing memorandum (the "IMIA Memo"), IMIA admits that the two complaints are "identical" except for the Second Amended Complaint's inclusion of a seventh cause of action seeking the imposition of an equitable lien. IMIA Memo at 2. Accordingly, this reply memorandum is

respectfully submitted in further support of Heller's motion to dismiss the fourth, fifth, sixth and seventh causes of action in the Second Amended Complaint (if leave to file it is granted), or, alternatively, to dismiss the fourth, fifth and sixth causes of action in the First Amended Complaint. Since IMIA also admits that its sixth cause of action claiming the existence of a state law boat lien fails to state a claim for relief upon which relief can be granted (see IMIA Memo at 19), this memorandum replies only to IMIA's arguments concerning its fourth, fifth and seventh causes of action.

## REPLY ARGUMENT

### POINT I

### IMIA'S CONSTRUCTIVE TRUST CLAIM FAILS TO STATE A CLAIM FOR RELIEF UPON WHICH RELIEF CAN BE GRANTED

"IMIA's claim of a constructive trust is based upon [Maryland] state law." IMIA Memo at 10. Yet, IMIA cites no Maryland case in which a secured lender has been forced to disgorge a payment received from the government where the secured lender committed no wrongful conduct in connection with its receipt of such payment. The reason why no such case is cited is because Maryland law is fully consistent with permitting a secured lender to keep the payment if it was made prior to the contractor defaulting under the government contract. See Finance Company of America v. United States Fidelity and Guaranty Company, 277 Md. 177, 185-86 (1976) (while a surety has a higher priority than a secured lender to a contract payment in the hands of the government after the contractor defaults, the secured lender's lien attaches to all payments due from the government entitling the secured lender to retain monies paid by the government prior to the contractor's default); see also The National Shawmut Bank of Boston v. New Amsterdam Casualty Co., 411 F.2d 843, 847-48 (1st Cir. 1969) (where the court collected case law from several jurisdictions that draws a bright line between those government

2

contract payments that are made and received by a secured lender before a contractor defaults and those that are to be made after the contractor defaults).

IMIA's brief overlooks this distinction and has chosen to rely on general Maryland case law setting forth the unremarkable legal proposition that a party may be forced to disgorge property under constructive trust principles where **that** party (a) acquired the property through fraud, duress, undue influence, mistake or through a breach of fiduciary duty, or (b) would be unjustly enriched if permitted to retain the property. IMIA Memo at 3, citing Wimmer v. Wimmer, 287 Md. 663, 668 (1980), a case cited in Heller's initial moving papers. Even these general principles of law cannot save IMIA's constructive trust claim in this case.

### (i) The Focus Must Be On Heller's Conduct and Equitable Position – Not BMI's

IMIA admits throughout its opposition papers that it cannot allege any facts that would support any wrongful conduct on Heller's part. See, e.g., IMIA Memo at 5-6 ("IMIA is not aware how Heller came to be in possession of all or part of the Change Order Request Proceeds once USA paid them over to [Baltimore Marine Industries, Inc. ("BMI"]"). Nevertheless, IMIA still argues that it should be entitled to the benefits of a constructive trust because of **BMI's** alleged wrongful conduct and IMIA's assertion that **BMI** would be unjustly enriched if Heller is permitted to keep the monies in Heller's possession. IMIA's view that Heller's conduct or equitable standing is irrelevant to IMIA's constructive trust claim is simply incorrect, as a matter of well-established Maryland constructive trust law.

The Maryland law requirement to focus on Heller's conduct and equitable position – and not BMI's – is illustrated by a detailed analysis of Starleper v. Hamilton, 666 A.2d 867 (Md. Ct. Spec. App. 1995), another case cited by Heller in its moving papers, but misapplied by IMIA. See IMIA

Memo at 11-12.  As shown below, Starleper requires the dismissal of IMIA's constructive trust claim because IMIA has failed to allege wrongful conduct by **Heller**, or facts supporting that **Heller** would be unjustly enriched if it is permitted to retain the monies.

In Starleper, as part of a marital settlement agreement with his ex-wife, a husband was contractually obligated to keep in full force and effect an existing life insurance policy for the benefit of the couple's minor child.  In violation of that express agreement, the husband, after remarrying, removed the ex-wife as beneficiary and named the husband's new wife as the policy's primary beneficiary.  After the husband died, and the life insurance proceeds were paid to the husband's second wife, the first wife, as champion of the minor child, sued to impose a constructive trust against the life insurance proceeds claiming that the second wife would be unjustly enriched if permitted to keep the proceeds.  Starleper, 666 A.2d at 868.  In defense, the second wife claimed that she would not be unjustly enriched since the life insurance proceeds constituted the repayment of a loan that the second wife allegedly had made to the deceased husband.  Id. at 869.  In ruling in favor of the first wife, the court held that the second wife's loan to the husband conferred no economic benefit to the minor child and therefore it would be inequitable for the second wife to retain the proceeds of the policy.  Id. at 871.

Starleper's rational was clearly not founded on the wrongful conduct of the deceased husband, or the fact that his estate would be unjustly enriched if the second wife was to be permitted to keep the monies.  To the contrary, the Starleper court focused on the first wife's allegation that the second wife would be unjustly enriched.  Id. ("we fail to see how [the second wife's] loans or payments would affect the equitable balance").  Accordingly, the holding in Starleper does not support IMIA's view of Maryland law that IMIA can focus only on BMI's alleged wrongful conduct or unjust enrichment.

4

Instead, the focus must be on what Heller did or did not do and whether Heller would be unjustly enriched if it is permitted to keep the monies.

The facts alleged by IMIA in both of its virtually identical complaints, and as to which this Court may take judicial notice (such as Heller's full documented security interest, see Heller's initial memorandum, at 3, n.2), are fatal to IMIA's constructive trust claim against Heller. Heller has done nothing improper, and it would not, as a matter of law, be unjustly enriched if it is permitted to keep the proceeds of its collateral. Heller's rights to the proceeds of its collateral were documented and perfected well before BMI even hired IMIA as a subcontractor to perform work on the RESOLUTE. IMIA, therefore, knew or should have known that Heller had superior rights to the proceeds. Unlike the second wife in Starleper, whose loan did not benefit the minor child one iota, Heller made millions of dollars of loans to BMI enabling it to perform government contracts and pay subcontractors, including IMIA. Thus, IMIA received a tangible economic benefit from Heller's loans.

IMIA's reliance on Starleper is also grossly misplaced given the stark differences between the facts in that case and those presented to this Court. The Starleper facts clearly paint an equitable landscape that cried out for the imposition of a constructive trust to protect a minor child. Here, IMIA is not a "babe in the woods" that needs such protection. To the contrary, BMI first contracted with and granted a security interest to Heller well before BMI hired IMIA as a subcontractor. IMIA, which is a sophisticated commercial entity, knew or had reason to know of Heller's security interest and lien. Nevertheless, IMIA chose with open eyes not to take any steps to protect itself against the normal operation of a secured creditor's fully disclosed and well-documented rights. It is therefore astonishing for IMIA to try to align itself with the minor child in Starleper that was in need of protection against the breach of an express agreement that pre-dated the second wife's alleged loan.

5

**(ii)     Heller's Lien Attached To The Proceeds**

Given the absence of any other Maryland case law to support its state law constructive trust claim against Heller, IMIA has chosen to rely upon federal "equitable lien" law to try to support IMIA's bald allegation that Heller would be unjustly enriched if it is permitted to keep the proceeds of its collateral. According to IMIA, the United States Supreme Court's decision in Pearlman v. Reliance Ins. Co., 371 U.S. 132, 136 (1962) stands for the proposition that Heller's lien never attached to the proceeds that are now in its possession. IMIA Memo at 8 ("[t]he underlying result is that Heller's alleged security interest **never attached** … to these proceeds (emphasis in the original)). Pearlman stands for no such proposition.[1]

The Pearlman decision has no relevance to the situation at hand because it did not involve the rights of a secured creditor to keep monies paid by the government prior to a default by the contractor. See The National Shawmut Bank, 411 F.2d at 847-48 (where the United States Court of Appeals for the First Circuit juxtaposed a Pearlman post-default situation against the rights of an assignee bank to keep earned progress payments paid to the assignee bank prior to a contractor default). In fact, Pearlman does not even involve a secured lender, such as Heller, an unsecured subcontractor, such as IMIA, or a government contractor, such as BMI that has fully performed its government contract. Instead, Pearlman involved a priority dispute between a surety and a trustee in bankruptcy over retainage monies held by the government after a contractor defaulted.

---

[1]  As stated above, there is also no Maryland case that stands for such a proposition. To the contrary, Maryland's Court of Appeals has already indicated that a secured lender's lien does attach to the monies due from the government, but that the secured lender's lien will have a lower priority than the rights of a surety to recover a payment that is due from the government after the contractor defaults. Finance Company of America, 277 Md. at 185-86.

IMIA's brief blatantly fails to recognize the distinction between the priorities to be accorded retainage monies in the hands of the government after a contractor defaults and government payments made before a contractor defaults. This distinction is fully recognized in cases such as National Union Fire Ins. Co. of Pittsburgh, PA . v. The United States Terre Haute First National Bank,, 304 F.2d 465 (Ct. Cl. 1962) and American Fidelity Co. v. National City Bank of Evansville, 266 F.2d 910, 915-16 (D.C. Cir. 1959) that were cited by Heller in its initial motion papers. In both of those cases, **which do involve the resolution of a secured lender's right to keep contract payments made prior to the contractor's default**, the secured lenders prevailed over the disgorgement claims of a surety because (a) the secured lenders committed no wrongful conduct, (b) the secured lenders' liens attached to the proceeds paid by the government, and (c) the proceeds were paid by the government prior to the contractor defaulting. National Union, 304 F.2d at 469; American Fidelity, 266 F.2d at 915; see also Reliance Insurance Co. v. U.S. Bank of Washington, N.A, 143 F.3d 502, 507 (9th Cir. 1998) (where the court also ruled in favor of a secured lender because "[t]his is not a case where the lender, in a dishonest transaction, collected money from the government with knowledge that the contractor had promised the surety to pay it into a fund for laborers and materialmen ahead of the lender").

IMIA tries to distinguish National Union and American Fidelity by arguing they involve a surety, not a subcontractor, and the payment at issue in such cases involved ordinary progress payments as opposed to a progress payment related to a change order, as in the instant case. These are distinctions without a difference. First, a surety possesses a bundle of rights that are much greater than those of any individual subcontractor, as is made clear by the Pearlman decision. If a surety's claims cannot defeat a secured lender's claims to keep payments made prior to a default by the contractor, then neither should the unsecured subcontractor that has less rights. Finally, the precise type of payment that is made by the

7

USA is not the relevant factor. Instead, the relevant factor is <u>when</u> the payment is made and whether the contractor is in default under the government contract at the time the payment was or is to be made. <u>See</u>, <u>e.g.</u>, <u>Finance Company of America</u>, 277 Md. at 185-86 (where Maryland Court of Appeals held a surety has priority as to payments to be made after a contractor defaults). Here, BMI did not default and was paid the monies freely by the USA. Heller, as BMI's secured lender, had every right to be paid and it is entitled to keep such payment. <u>Reliance Ins.</u>, 143 F.3d at 507; <u>National Union</u>, 304 F.2d at 469; <u>American Fidelity</u>, 266 F.2d at 915.

**POINT II**

**IMIA HAD NO MARITIME LIEN ON
THE FUNDS IN THE HANDS OF THE USA**

IMIA asserts that valid maritime liens have priority over a perfected Article 9 security interest (<u>see</u> IMIA Memorandum, pp. 11-12). This assertion is immaterial since (a) IMIA does not have a **valid** maritime lien for the reasons set forth in the USA's motion to dismiss, and, in any event, (b) the monies paid by the USA were general public funds that were not the proceeds of any maritime lien. <u>See</u>, <u>e.g.</u>, <u>Department of the Army v. Blue Fox, Inc.</u>, 525 U.S. 255, 263 (1998) ("sovereign immunity bars creditors from attaching or garnishing funds in the Treasury"). Thus, since general government funds are involved, IMIA never had any lien on such funds and does not have the right to sue the USA in this matter to force it to pay IMIA directly for having paid out general funds to BMI. <u>See</u>, <u>e.g.</u>, <u>United States v. Munsey Trust Co.</u>, 332 U.S. 234, 241 (1947) ("laborers and materialmen do not have enforceable rights against the United States for their compensation").

As previously pointed out in Heller's initial memorandum, even if the Court were to assume that IMIA may have had a valid maritime lien on the proceeds that were paid by the USA, that does not

mean that IMIA has the right to trace the funds into Heller's hands and force it to disgorge those funds to IMIA. Instead, even if there was a valid maritime lien on the funds, IMIA would only be able to force disgorgement if Heller committed some wrong to obtain possession of the funds or would be unjustly enriched if it is permitted to keep the funds. Since, as noted above, that is not the case, even if IMIA had a valid maritime lien on the funds, Heller is entitled to keep the funds since IMIA's constructive trust claim and ability to trace the funds into Heller's hands is meritless.

## POINT III

## IMIA HAS NO VIABLE EQUITABLE LIEN CLAIM

IMIA admits that Maryland common law fails to provide it with any rights to the funds in Heller's hands under any state law equitable lien theory. IMIA Memo at 18. This is not surprising since there is no Maryland case law that provides for the imposition of any equitable lien against government contract payments tendered to an innocent secured lender prior to a default under a government contract. See Finance Company of America, 277 Md. at 186 (a secured lender's lien attaches to government contract payments made before a default under that contract); see also Scott & Wimbrow, Inc. v. Calwell, 31 Md. App. 1, 6 (Ct. Spec. App. 1976) ("'there can be no existing [equitable] lien on property until and unless the claimant prevails either in a suit to enforce the claimed lien or in some other appropriate proceeding providing for notice and a hearing (i.e., a declaratory judgment action)'"). Accordingly, since the monies were paid out by the USA before BMI defaulted and were received by Heller before this action was commenced, the monies received by Heller were never impressed with any state law equitable lien in IMIA's favor.

It is precisely because state law is unavailing that IMIA has determined to disregard state law and claim that its "equitable lien" arises under federal law. It should be pointed out that IMIA's claim

9

that federal law should provide the rule for decision is incorrect.  Reliance Ins. Co., 143 F.2d at 505 (where the United States Court of Appeals for the Ninth Circuit applied state, not federal law, to a priority dispute since the "federal interest is unaffected by conflicting claims by the surety and the lender to a progress payment already made" by the government).  In any event, federal law is fully consistent with Maryland law in holding that there is no equitable lien that can be used to force a secured lender to disgorge payments received prior to the contractor defaulting on a government contract.  Compare American Fidelity, 266 F.2d at 915 with Finance Company of America, 277 Md. at 186.

Pearlman, and the cases that have followed it, some of which IMIA cites in its brief, are not helpful to IMIA since they do not involve the resolution of a secured lender's right to keep payments made by the government prior to the contractor defaulting under the relevant government contract.  For instance, IMIA cites to Universal Bonding Ins. Co. v. Gittens & Sprinkle Enterprises, Inc., 960 F.2d 366 (3d Cir. 1992) and Matter of RAH Development Co., 184 B.R. 525 (Bankr. W.D. Mich. 1995) in support of its equitable lien claim.  Unlike the present situation, where the USA paid BMI under a government contract that was not in default and Heller received the proceeds of its collateral, in both Universal Bonding and RAH Development the courts addressed competing property claims to funds retained by the government, which funds had not been paid to any party as a result of the contractor's default.

Similarly, IMIA's reliance on U.S. v. TAC Const. Co., 760 F. Supp. 590 (S.D. Miss. 1991) and Active Fire Sprinkler Corp. v. Untied States Postal Service, 811 F.2d 747 (2d Cir. 1987) is also misplaced, as they also address the situation of competing claims concerning retained funds being held by the government after a contractor's default.  Here, the proceeds were not retained by the government, but were freely paid by the USA and then given to Heller pursuant to its perfected security

interest in BMI's accounts receivable entitling Heller to retain them as the proceeds of its collateral. See, e.g., American Fidelity, 266 F.2d at 915-16 (where progress payments made by government were paid to bank, as assignee of the contractor, the mechanics and materialmen "never had any legal or equitable rights to the proceeds of the contract and so had no right to recover the progress payments from the assignee bank").

## CONCLUSION

For the foregoing reasons, and those previously stated in Heller's initial moving papers, it is respectfully requested that the Court grant Heller's motion to dismiss.

Dated:   April 25, 2003

                                        **PIPER RUDNICK LLP**
                                        Attorneys for Defendant
                                        Heller Financial, Inc.

                                        /s/ Jodie E. Buchman (Bar No. 26004)
                                        6225 Smith Avenue
                                        Baltimore, MD 21209
                                        Tel. (410) 580-3000
                                        Fax (410) 580-3001

Of Counsel:

    John P. Amato (admitted *pro hac vice*)
    Hahn & Hessen LLP
    488 Madison Avenue
    New York, NY 10022
    Tel.  (212) 478-7200
    Fax:  (212) 478-7400