IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

| | | |
|---|---|---|
| INTERNATIONAL MARINE & | ) | |
| INDUSTRIAL APPLICATORS, INC., | ) | |
| an Alabama Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. MJG-02CV-3542 |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, and | ) | |
| | ) | |
| BALTIMORE MARINE | ) | |
| INDUSTRIES, INC., and | ) | |
| | ) | |
| HELLER FINANCIAL, INC. | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO THE
MOTION TO DISMISS OF DEFENDANT HELLER FINANCIAL, INC.**

I.      **Introduction.**

In its Complaint, IMIA has alleged sufficient facts to support causes of action based upon

constructive trust, unjust enrichment, maritime and equitable liens against Defendant Heller

Financial, Inc. ("Heller") as a result of Heller's receipt of the proceeds of IMIA's Request for Change

Order in the amount of $2,181,398.12, which was paid by the USA to BMI for intended delivery to

IMIA.

Neither Heller nor BMI has revealed how Heller came to be in possession of all or part of the

Change Order Request Proceeds once they were paid to BMI by USA.  Heller has filed with this

Court its Motion to Dismiss IMIA's claims against it, arguing that under Maryland law, IMIA has

failed to allege sufficient facts to support a constructive trust claim against Heller. Heller further argues that all of IMIA's legal and/or equitable lien theories are without merit and therefore, should be dismissed. Notwithstanding Heller's arguments in support of its Motion to Dismiss, IMIA will demonstrate that it has alleged sufficient facts in its Third Amended Complaint to state causes of action for constructive trust, and equitable and maritime lien theories in order to support recovery of the funds held by Defendant, Heller.

## II.    IMIA Need Only Meet the Notice Pleading Requirements to Survive a Motion to Dismiss.

The Federal Rules of Civil Procedure ("Rules") do not require IMIA to set out in **detail** the facts upon which IMIA bases its claim. To the contrary, all the Rules require is a 'short and plain statement of the claim' that will give the Defendant fair notice of what the Plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). "[T]he accepted rule [is] that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45-46. (citations omitted). Nonetheless, "a plaintiff is not charged with 'forecast[ing] evidence sufficient to prove an element' of her claim, *Bass v. E.I. du Pont de Nemours & Co.*, 2003 WL 1558201, *3 (4th Cir. 2003) (quoting, *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002), but need only **allege** facts that support a claim for relief." *Bass*, 2003 WL 1558201 at *3. (Emphasis added.) Furthermore, "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Conley*, 355 U.S. at 48. Based on these well-established principles and for the reasons discussed in further detail below, Heller's Motion to Dismiss should be denied.

**III.    IMIA Has Sufficiently Alleged a Cause of Action Against Heller for a Constructive Trust.**

The Maryland Court of Appeals in *Wimmer v. Wimmer*, 414 A.2d 1254 (Md. 1980), explained the purpose and scope of a constructive trust:

> A constructive trust is the remedy employed by a court of equity to convert the holder of the legal title to property into a trustee for one who in good conscience should reap the benefits of the possession of said property.  The remedy is applied by operation of law where property has been acquired by fraud, misrepresentation, or other improper method, **or whether circumstances render it inequitable for the party holding the title to retain it.** [Citations omitted.]  The purpose of the remedy is to prevent the unjust enrichment of the holder of the property.

*Wimmer*, 414 A.2d at 1258 (emphasis added.)

IMIA, with the full knowledge, consent and authority of Defendant United States of America ("USA"), entered into a Subcontract Agreement to perform services on the RESOLUTE (AFDM-10) at the request of Defendant, Baltimore Marine Industries ("BMI").  (Third Amended Complaint, ¶ 8.)  In performance of its Subcontract, IMIA performed repairs and maintenance on the RESOLUTE which included staging, surface preparation, coating, and cleaning.  (Third Amended Complaint, ¶ 10.)  Upon completion of its services on the RESOLUTE, IMIA submitted to the USA, through BMI, its Change Order Request in the amount of $2,181,398.12 for additional work and changes on the RESOLUTE beyond the scope of IMIA's original Purchase Order.  (Third Amended Complaint, ¶ 13.)  IMIA's Change Order sought payment for direct job costs only, and did not include claims for unliquidated amounts.  *Id*.  Furthermore, when BMI forwarded IMIA's Change Order Request to USA, BMI added thereto its own request for additional sums, the exact nature and amount of which are unknown to IMIA.  *Id*.

In October of 2002, BMI negotiated an agreement with USA for amounts which included IMIA's Change Order Request. (Third Amended Complaint, ¶ 16.) It was only through collateral sources that IMIA learned that USA had paid BMI. *Id.* Thus, BMI concealed the fact of the payment and the details thereof from IMIA. *Id.* BMI's actions were in direct contradiction to BMI's repeated promises made to IMIA that it would be kept informed of the progress of negotiations with USA and that BMI would consult with IMIA prior to entering into any agreement with USA. *Id.* More importantly, IMIA was informed and believes and has alleged in its Complaint that the payment from USA to BMI for IMIA's work was based upon the representations by BMI to USA that, upon receipt of payment from USA, it would immediately deliver those sums belonging to IMIA. Third Amended Complaint, ¶ 17.) This allegation of fact is evidenced by a letter, incorporated into the Third Amended Complaint, from the Navy Contracting Officer, addressed to BMI, which states in pertinent part:

> As I am sure you are aware of, Baltimore Marine Industries ("BMI") settled its claim, **partly on behalf of IMIA**, and has been paid the agreed settlement amount. The settlement was **fully intended by the Parties to the settlement to cover the subcontract claim of IMIA**, which Mr. Kelly is complaining about.

(Emphasis supplied.) A true and correct copy of the Contracting Officer's letter is attached to the Third Amended Complaint as Exhibit 1A to the Affidavit of James A. Kelley. As a result, BMI acquired IMIA's portion of the Change Order Request proceeds in direct violation of its Agreement with both USA and IMIA. *See Wimmer*, 414 A.2d at 1258 (1980). IMIA had a good equitable claim of entitlement to the Change Order Request proceeds resulting from IMIA's expenditure of funds, labor, and material. IMIA relied, to its detriment, upon BMI's repeated promises that it would deliver the proceeds to IMIA, resulting in the unjust enrichment of BMI and Heller. *See id.* IMIA

does not know how Heller came to be in possession of all or part of the Change Order Request Proceeds once USA paid them over to BMI.

The facts in IMIA's Third Amended Complaint clearly allege that BMI "acquired by fraud, misrepresentation, or other improper methods" the proceeds from IMIA's Change Order Request. *Wimmer*, 414 A.2d at 1258. Therefore, this Court is entitled to employ a constructive remedy converting the holder of legal title to the Change Order Request Proceeds into a trustee for IMIA, who, in good conscience, should reap the benefits of the possession of said property. *Wimmer*, 414 A.2d at 1258.

### A.    IMIA is not Required to Allege that Heller has Committed a Wrong to Establish Constructive Trust under Maryland Law.

Heller's argument, that IMIA must show that Heller itself committed some wrong in order to allege a cause of action for a constructive trust, is simply incorrect. Maryland law does not require IMIA to allege that Heller did anything **wrong** in receiving IMIA's Change Order Proceeds. *See Wimmer*, 414 A.2d at 1258 (constructive trust appropriate "where the circumstances render it inequitable for the party holding title to retain it."); *Starleper v. Hamilton*, 666 A.2d 867, 869-70 (Md. Ct. Spec. App. 1995) (commenting that the Maryland Supreme Court in *Wimmer* confirmed the imposition that a constructive trust is not premised upon a finding that party whose property is subject to trust committed some wrong.)

The facts in IMIA's Complaint sufficiently allege that BMI acquired title to IMIA's Change Order Request Proceeds through fraud and/or the misrepresentation by BMI that it would immediately deliver the Change Order Request Proceeds to IMIA upon receipt. Thus, as a result of the BMI's wrongful conduct, as alleged in IMIA's Complaint, it would be "inequitable for the title holder [Heller] to retain the property" as the "purpose of imposing a constructive trust is to prevent

unjust enrichment of the title holder." *Wimmer*, 414 A.2d at 1258; *Bowie v. Ford*, 304 A.2d 803 (Md. 1973)  Stated differently, IMIA has alleged that Heller's possession of its Change Order Request Proceeds is a direct and proximate result of BMI's wrongful conduct, and under Maryland law it would be inequitable and contrary to good conscience for Heller to "reap the benefits of possession" because of BMI's fraudulent misrepresentations.

Heller's lengthy analysis of *Starleper* is confusing.  That analysis does not address the issue of how the Maryland Court of Special Appeals' decision in *Starleper* defeats IMIA's claim for a constructive trust against Heller.  Heller initially cites *Starleper* for the contention that Maryland law requires that IMIA show that Heller engaged in some type of wrongdoing.  As discussed above, the Court, in *Wimmer,* has made it unequivocally clear that a party seeking to impose a constructive trust does not have to show any wrongdoing; instead a party can allege that property has been acquired by "**other improper method, or where circumstances render it inequitable for the party holding the title to retain it.**"  *Wimmer*, 414 A.2d at 1258.

The Court of Special Appeals, in *Starleper,* specifically acknowledged that the imposition of such a trust is not dependent  upon a finding of wrongdoing by the party who has possession of the property.  *Starleper*, 666 A.2d at 869-870.[1]  Accordingly, Heller's reliance on *Starleper* is clearly

---

[1]     The court in *Starleper* further expounded on incorrect view that wrongdoing on the part of the party in possession of the property that is the subject to the constructive trust:

> The immediate problem in ths instant case is the court's apparent view that a constructive trust is impermissible because Sandra [the second wife substituted as beneficiary] had done nothing wrong in accepting the insurance proceeds [cf., Heller argues that it has done nothing wrong in taking IMIA's Change Order Proceeds from BMI].  As we indicated however, wrongdoing on Sandra's part is **not a necessary precondition.**  The test is whether, under **all the circumstances**, it would be **inequitable** for Sandra to retain the

misplaced. In fact, *Starleper* supports IMIA's claim for a constructive trust against the Change

Order Request Proceeds in the hands of Heller.

      **B.**     **IMIA Confidential Relationship with BMI Creates Constructive Trust.**

     In addition to the reasons cited above for imposing a constructive trust, the Court of Appeals

of Maryland in *Carter v. Abramo*, 93 A. 2d 546, 548 (Md. 1953) stated:

> [W]here property is conveyed to a person upon his oral promise to
> hold it and later reconvey it to others, and at the time of the
> conveyance he stands in a confidential relation to the others, a court
> of equity will not allow him to keep the property and be unjustly
> enriched, but will compel him to transfer the title to the parties
> equitably entitled to it, even though he may have intended at the time
> of the conveyance to carry out the agreement, and even though he was
> not guilty of fraud, undue influence, or any other abuse of the
> confidential relation in procuring the conveyance. A confidential
> relation exists in cases . . . wherever confidence is reposed by one
> person and accepted by another.

*Carter v. Abramo*, 93 A.2d at 548 (citing *Grimes v. Grimes*, 40 A. 2d 58 (Md. 1944); *Rice v. Rice*, 41

A.2d 371 (Md. 1945)). IMIA has alleged in its Third Amended Complaint that BMI made repeated

promises to both USA and IMIA that BMI would convey the proceeds of IMIA's Change Order

Request that BMI submitted to USA on IMIA's behalf to IMIA when USA made final payment to

BMI. Furthermore, BMI was the prime contractor on the RESOLUTE project and IMIA was a

subcontractor. IMIA was dependent upon BMI to use its influence and control as prime contractor to

submit its Change Order Request to USA. IMIA was further dependent upon BMI's assurances that

it would deliver to IMIA the proceeds of its Change Order Request once it received payment from

---

> proceeds of the policy, directly or through their conversion to her
> property.

*Starleper*, 666 A.2d at 871.

USA.   See, *Wimmer*, 414 A.2d at 1258 (confidential relationship exists where under the circumstances, "such party is justified in assuming that the other will not act in a manner inconsistent with his or her welfare.")

Additionally, the relationship between IMIA and BMI was of a confidential or fiduciary nature as BMI exercised influence and control with respect to the submission and payment of IMIA's Change Order Request to USA.   IMIA has alleged that it reposed trust and confidence in BMI that it would stick to its word that it would pay the proceeds due and owing to IMIA.   *See Wenger v. Rosinsky*, 192 A. 2d 82, 86-87 (Md. 1963) ("whenever there is a confidential or fiduciary relation between two parties wherein trust and confidence are reposed on one side and influence and control are exercised on the other, a court of equity will interpose on the ground of public policy to prevent the weaker party from stripping himself of his property.")

Therefore, when the USA paid the Change Order Request proceeds over to BMI, a constructive trust arose upon the proceeds in favor of IMIA.   Although BMI may have subsequently turned the funds over to Defendant, Heller, IMIA is entitled to trace the proceeds from the hands of BMI to those of Heller.

### C.     Heller's Alleged Security Interest Never Attached.

Heller's alleged security interest **never attached** to the Change Order Request Proceeds because these proceeds were never in any way the property of BMI.   *See Pearlman v. Reliance Ins. Co.*, 372 U.S. 132, 136 (1962) (where subcontractor has equitable interest in funds, any property interest asserted by other parties in said funds does not attach.)   BMI was to serve as a mere conduit for IMIA to receive payment for the services that it rendered on the RESOLUTE from USA.   (Third Amended Complaint, ¶¶ 16-20.)   As evidenced by IMIA's Third Amended Complaint and the letter

from the Navy Contracting Officer addressed to BMI (see Exhibit 1A to IMIA's Third Amended

Complaint) the Change Order Request Proceeds never belonged to BMI and were to be properly paid

over to IMIA.  Therefore, Heller's alleged security interest **never attached** to said proceeds since the

Change Order Request Proceeds never properly belonged to BMI as BMI was a fiduciary/trustee

acting for the sole benefit of IMIA.  BMI was merely a conduit through which IMIA was forced to

submit its Change Order Request for work performed on the RESOLUTE.  Quite simply, the Change

Order Request Proceeds were never the property of BMI, and Heller's lien could therefore never

attach.

Whether or not IMIA knew or should have known that Heller allegedly has superior rights to

the proceeds, as Heller argues, misses the point.  Heller may have an alleged security interest in any

proceeds received by BMI that went above and beyond the Change Order Request Proceeds intended

for IMIA, but not in the Change Order Proceeds as these monies were due and owing specifically to

IMIA for work done on the RESOLUTE in excess of the initial contract price.

Heller misconstrues *Finance Company of America v. United States Fidelity & Guaranty

Company*, 353 A.2d 249 (Md. 1976), as standing for the proposition that a secured lender's Article

Nine security interest attaches to all payments due from the government.  *Finance Co. of America*

involved a priority dispute between a surety and a secured creditor of a defaulting contractor with

respect to funds interpleaded into Circuit Court by the state.  The case is factually different from the

instant case.  The instant case is not an interpleader case, and does not involve a priority dispute

between a surety and a secured creditor.  IMIA performed services on the RESOLUTE, as a

subcontractor, and provided services and equipment beyond the initial contract terms for which it

submitted a Change Order Request through BMI to USA.  BMI then fraudulently misrepresented to

IMIA and the USA that it would give IMIA it Change Order Proceeds upon receipt from USA.

Heller makes a broad leap in its assertion that *Finance Co. of America* states that a secured creditor

will always be entitled to **all** contract proceeds in the hands of the government. Moreover, the

continued applicability of *Finance Co. of America* is questionable due to Maryland's adoption of

Revised UCC Article Nine, effective July 1, 2001.

### D. IMIA's Change Order Proceeds do not come within the Purview of Maryland's Uniform Commercial Code.

Heller's alleged UCC Article Nine security interest may have never attached to IMIA's

Change Order Request proceeds in the possession of USA. There is no allegation before the Court

that Heller adhered to the requirements of the Assignments of Claims Act, otherwise known as the

"Anti-Assignments Act." 31 U.S.C. § 3727 and/or the Assignment of Contracts Act, 41 U.S.C. § 15.

Section 3727 reads in relevant part:

> (a) In this section, "assignment" means–
> (1) a transfer or assignment of any part of a claim against the United States
> Government or of an interesting the claim; or
> (2) the authorization to receive payment for any art of the claim.
> (b) An assignment may be made only after a claim is allowed, the amount of the
> claim is decided, and a warrant for payment of the claim has been issued. The
> assignment shall specify the warrant, must be made freely, and must be attested
> by 2 witnesses. The person making the assignment shall acknowledge it before an
> official who may acknowledge a deed, and the official shall certify the
> assignment. The certificate shall state that the official completely explained the
> assignment when it was acknowledged. An assignment under this subsection is
> valid for any purpose.
> (c) Subsection (b) of this section does not apply to an assignment to a financing
> institution of money due or to become due under a contract providing for
> payments totaling at least $1,000.00 when–
> (1) the contract does not forbid an assignment;
> (2) unless the contract expressly provides otherwise, the assignment–
> (A) is for the entire amount not already paid;
> (B) is made to only one party, except that it may be made to a party as agent or
> trustee for more than one party participating in the financing; and
> (C) may not be reassigned; and

(3) the assignee files a written notice of the assignment and a copy of the assignment with the contracting official or the head of the agency, the surety on a bond on the contract, and any disbursing official for the contract.

Numerous factual issues exist as to whether or not Heller has complied with the Anti-Assignment Act.  A determination as to whether Heller complied with the Act would entail a detailed factual analysis that would be clearly inappropriate to address on a Motion to Dismiss.  Additionally, the Maryland Court of Appeals in *Brown v. Coleman*, 566 A.2d 1091 (Md. 1989) has said that "a constructive trust is based not on a 'preference' over other creditors but on a property right."  *Id.* at 1097.  Thus, if the Court imposes a constructive trust on the funds held by BMI and/or Heller, those funds will be considered the property of IMIA.  *Id.*  The latter point is made clear in *County Commissioner of Frederick County v. Page*, 164 A. 182 (1933):

> It is wholly inaccurate to use the term "preferred claim" when the effort is to secure from the possession of a receiver certain funds which are claimed to be a special deposit, or where it is sought to recover a trust fund.  In the latter instance, the claimant says that the receiver has certain funds in his hands which he is holding in trust for the claimant which claimant is seeking to recover.  It is quite apparent, therefore, that in the latter instance it is not a question of preference among various creditors of the insolvent estate, **but an effort to secure funds which <u>never, in law,</u> did belong to the estate in the hands of the receiver**.

*Page,* 164 A. at 190.  As argued above, in Section C, Heller's alleged security interest **never attached** to the Change Order Request Proceeds because the proceeds **never, as a matter of law, belonged to BMI or Heller**.  Moreover, a "creditor [Heller] has no right to share in that which is shown not to belong to the debtor [BMI]."  *Drovers & Mechanics' Nat. Bank v. Roller*, 37 A. 30, 32 (Md. 1897).  As evidenced by the letter from the Navy Contracting Officer, the payment made by USA included IMIA's Change Order Request Proceeds, which the Contracting Officer expressly stated were to go to IMIA.  (*See* Ex. 1A to IMIA's Third Amended Complaint).

E.    **Heller's Argument that IMIA cannot Trace the Funds in the Possession of BMI and/or Heller is Premature.**

Heller argues that IMIA's constructive trust claim against it fails because IMIA cannot trace the funds and because IMIA only makes a "blanket assertion" that Heller had taken possession or control over IMIA's Request for Change Order Proceeds.  *See* Heller Mem. in Supp, p. 8.  First, the cases cited by Heller did not involve a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted.  Rather, each record before the appellate court in *Brown* and *Drovers* involved extensive factual records from which the court determined whether the funds could be traced.  At this initial stage of the suit, IMIA does not have, nor could it have, the detailed factual information surrounding the disbursement of IMIA's Change Order Request by USA to BMI and from BMI to Heller.  These facts will be fleshed out during discovery, and an argument that IMIA cannot trace the funds is inappropriate until summary judgment.

Second, the language used by the court in *Brown* with regard to tracing funds is indicative of principles of proof and evidence as opposed to stating a claim in a Complaint: "*a cestui que trust* [must generally] establish by clear evidence that his funds be traced to the account or property over which he seeks to impose a constructive trust."  *Brown*, 566 A.2d at 1097.   As a result, Heller's tracing argument is premature.

Accordingly, Heller's Motion to Dismiss IMIA's Fourth Cause of Action must be denied based upon the foregoing and the fact that Heller has cited no authority holding that a secured creditor trumps a constructive trust.  Heller's "documented security interest" and allegedly "proper" conduct are far from being "fatal" with respect to whether IMIA has alleged a constructive claim against Heller.

**IV.    IMIA's Maritime Lien Takes Priority Over Heller's Alleged Security Interest in the Change Order Proceeds**.

Heller essentially relies upon the United States' Motion and reply Memorandum in Support of its Motion to Dismiss IMIA's maritime lien claim as support for Heller's position that the Maritime Commercial Instruments and Lien Act ("MCILA") expressly bars maritime liens on public vessels and therefore any maritime lien theory asserted by IMIA must fail.  IMIA contends that it possesses a maritime lien on the Change Order Request proceeds paid over by USA to BMI and/or Heller pursuant to 46 U.S.C.A. § 31342, based upon the *in personam* provisions of the Suits in Admiralty Act, 46 App. U.S.C.A. §§ 741-752 (Supp. 2002).  By reference, IMIA incorporates its Memorandum in Response to the United States' Motion to Dismiss as if fully set forth herein as its argument in support of its cause of action for a maritime lien against Heller.

Several cases have held that valid maritime liens under MCLIA, 46 U.S.C.A. §§ 31301-31343, have priority over a perfected Uniform Commercial Code security interest.  Valid maritime liens under 46 U.S.C.A. § 31342(a), have priority over a perfected Uniform Commercial Code security interest.  *Matter of Topgallant Lines, Inc.*, 154 B.R. 368 (S.D. Ga. 1993), *aff'd without published opinion*, 20 F.3d 1175 (11th Cir. 1994), *rehearing and suggestion for rehearing en banc denied*, 49 F.3d 734 (11th Cir. 1995).  MCLIA automatically gives rise to a maritime lien when a person furnishes necessaries to a vessel, the court explained, and neither intent nor consent is involved in the lien's formation.  *Id*. at 376.  Heller's misstates the law when it argues, "to the extent that IMIA's cause of action is base on *in rem* principles of liability, maritime lien holders only have the right to seize the vessel, have it sold," and be repaid from the proceeds of the sale.  (See Heller Mem. in Supp., p. 12)  IMIA proceeds against the Government

*in personam* based upon *in rem* principles of liability pursuant to the Suits in Admiralty Act. IMIA had a maritime lien on its Request for Change Order Proceeds is therefore entitled to trace or follow the proceeds of its maritime lien into the hands of BMI and Heller.

The scope of Maryland's version of UCC Article Nine makes the UCC inapplicable to a security interest subject to any statute of the United States. Maryland Code Section 9-109(c)(1) states that Maryland's Article Nine does not apply to the extent that "[a] statute, regulation, or treaty of the United States preempts this title." MD. CODE ANN., COM. LAW IX § 9-109 (1999). Section 9-311 further states that "the filing of a financing statement is not necessary or effective to perfect a security interest in property subject to a statute, regulation or treaty of the United States whose requirements for a security interest's obtain priority over the rights of a lien creditor with respect to the property preempt § 9-310(a)." MD. CODE ANN., COM. LAW § 9-311 (1999). MCILA preempts Maryland's Article Nine.

Because maritime liens prevail over non-maritime claims, Heller's alleged UCC security interest is subordinate to IMIA's valid maritime lien on the RESOLUTE and its freights. *In re Topgallant Lines,* 154 B.R. at 376; *see also United Shipping Services Three, Inc. v. U.S. Express Lines, Ltd.*, No. CIV. A. 98-950, 1998 WL 770599 (E.D. Pa. Nov. 5, 1998) (maritime lien will have priority over security interest perfected under UCC Article 9), (citing *The J.E. RUMBELL*, 148 U.S. 1 (1893) (maritime lien had priority in admiralty over a mortgage encumbering a ship)); *Western Bulk Carriers (Australia), Ltd. v. P.S. International, Inc.,* 164 B.R. 616, 619-22 (S.D. Ind. 1994) (maritime lien has priority over all non-maritime claims, including perfected UCC security interests.)

Heller also argues that, assuming that IMIA has the right to proceed against the United States to obtain an *in personam* judgment, that does not mean that IMIA ever had a maritime lien on the general public funds that the United States used to pay BMI which have now been paid in all or part to Heller. (Heller's Mem. In Supp. of its Motion to Dismiss, p. 13.) Heller's assertion that the funds in the hands of the United States were "unencumbered general public funds" ignores IMIA's causes of action that directly assert maritime lien, equitable lien, and constructive trust on the "unencumbered" funds in the hands of the United States which were specifically identified or earmarked as being due and owing for services performed on the RESOLUTE. Moreover, whether or not USA paid BMI out of general unencumbered public funds is a question of fact inappropriate for resolution on a motion to dismiss. Based on IMIA's equitable and statutory theories of recovery, IMIA seeks to trace the funds paid by USA which are now in the hands of BMI and/or Heller.

## V.    **IMIA Possesses an Equitable Lien Upon the Change Order Proceeds Now in the Hands of BMI and/or Heller.**

The equitable rights of unpaid subcontractors to construction balances are long-recognized by decisions of the United States Supreme Court. In *Henningsen v. United States Fidelity & Guar. Co.*, 208 U.S. 404, 410 (1908), the Supreme Court stated that the Government had "equitable obligations to see that the laborers and supply men were paid." The Supreme Court reaffirmed that recognition in *Pearlman v. Reliance Insurance Co.*, 371 U.S. 132 (1962), stating that **"laborers and material men had a right to be paid out of the fund**." *Id*. at 141 (emphasis added). IMIA, an unpaid federal subcontractor, seeks to declare and enforce such equitable rights against Heller and/or BMI, because those entities now have possession of IMIA's Request for Change Order Proceeds to which IMIA has an equitable entitlement.

For many years, the federal courts have permitted sureties on government contracts to enforce related rights. Thus, in *Pearlman*, the Court upheld a surety's right to reimbursement from remaining contract monies, reasoning that the surety, having paid the laborers and material men, was entitled to the benefit of the rights of the persons it paid. *Pearlman*, 371 U.S. at 141. Therefore, if the surety's right to reimbursement rests on the rights of the subcontractors it paid, it stands to reason that the subcontractors themselves should be able to assert those rights where there is no surety or performance bonds. IMIA was a federal subcontractor who, with the full knowledge and of consent of USA, performed repairs and maintenance on the vessel RESOLUTE with all of said work being accepted by USA. (Third Amended Complaint, ¶ 10.) At all times material, before, during and after the rendition of such services by IMIA, Defendant USA was aware that IMIA would be rendering such services and that IMIA was relying upon the credit of the RESOLUTE for payment. (Third Amended Complaint, ¶ 12.)

Upon completion of its services on the RESOLUTE, IMIA submitted to USA, through BMI, its Change Order Request in the amount of $2,181,398.12 for increased work and changes on the RESOLUTE, beyond the scope of IMIA's original Purchase Order. ( Third Amended Complaint, ¶ 13.) Furthermore, it is IMIA's belief that BMI added its own pay requests to IMIA's Change Order Request submitted to USA. *Id.* More importantly, upon information and belief, USA paid BMI the funds from IMIA's Change Order Request based upon representations by BMI to USA that upon receipt of payment from USA, BMI would immediately deliver the change Order Request proceeds to IMIA. (Third Amended Complaint, ¶ 17.) Based upon BMI's representations to USA, USA delivered the sums to BMI to which IMIA was entitled for its Change Order Request on the RESOLUTE notwithstanding the fact that BMI and USA were

aware of IMIA's entitlement to receive these funds to which BMI has refused to pay. (Third Amended Complaint, ¶ 18.)

As a result of the services rendered upon the RESOLUTE by IMIA, with the full consent and knowledge of BMI and USA, IMIA is entitled to an equitable interest or equitable lien on the proceeds paid by USA to BMI for services rendered upon the RESOLUTE which included IMIA's Change Order Request. *See Universal Bonding Ins. Co. v. Gittens & Sprinkle Enterprises, Inc.*, 960 F.2d 366, 375-377 (3rd Cir. 1992) (once funds are received by prime contractor, they will constitute an equitable trust for the benefit of laborers and material men. Because laborers and materialmen retain equitable interest in the funds paid to the prime contractor by the Government, they may enforce their interest in the funds.); *Matter of RAH Development Co., Inc.*, 184 B.R,. 525, 535-538 (Bankr. W.D. Mich. 1995 (subcontractor entitled to equitable lien upon funds in the hands of bankruptcy trustee.);

Moreover, once USA became a stakeholder, USA had an equitable obligation to see that IMIA received payment which it failed to do. As in *Pearlman*, the Government in the instance case is a stakeholder–someone other than USA is entitled to receive the funds on the project. USA's sole interest as stakeholder is to insure that laborers and materialmen such as IMIA have been paid. Once IMIA put USA on notice that it had not been paid by IMIA, USA had an obligation to pay IMIA out of the retained fund. *Pearlman*, 371 U.S. at 141.

IMIA's rights in the funds or proceeds paid by USA to BMI are superior to those of BMI. *U.S. v. TAC Const. Co., Inc.*, 760 F.Supp. 590, 593 (S.D. Miss., 1991). Moreover, IMIA's equitable interest in the proceeds once they were paid over to BMI were superior to any security interest held by Heller. *Id*. at 594. *See also Active Fire Sprinkler Corp. v. United States Postal*

*Service*, 811 F.2d 747, 755-56 (2nd Cir. 1987) (sureties, who had compensated the unpaid laborers and suppliers, had claims to the unpaid contract balances superior to the claims of bankruptcy estates and creditors.); *In re Pyramid Industries, Inc.*, 210 B.R. 445, 448 (N.D. Ill. 1997) (unpaid subcontractors take priority over secured creditors), *rev'd on other grounds, U.S. v. Maxwell*, 157 F.3d 1099 (7th Cir. 1998).

Heller relies upon *Reliance Ins. Co. v. U.S. Bank of Washington, N.A.*, 143 F. 3d 502 (9th Cir. 1998), for the proposition that IMIA can have no equitable lien based upon federal law. In *Reliance Ins. Co.*, Reliance was a surety on a government contract to improve a Coast Guard Station and Bank of Washington was the bank who made the construction loan to the general contractor. *Id.* at 504. Pursuant to an assignment in the contract, the government wired progress payments directly into the contractor's account at the bank. *Id.* Eventually the general contractor ran into financial difficulties and subcontractors began to complain to the surety. *Id.* at 505. The government wired $280,319.00 into the contractor's bank account at Bank of Washington. *Id.* At the time the money was transferred the bank knew that the general contractor was having financial problems but did not know of the subcontractors complaints. *Id.* Shortly after the deposit, the contractor notified the government and the surety that it was declaring itself in default, *id,* and consented to have all future payments sent to the surety. *Id.* The surety then contacted Bank of Washington and told the bank that the previous $280,319.00 deposit should be used to pay materialmen. *Id.* The bank, however, took the position that it had first claim to the money, and chose to treat the payment as a setoff against what the contractor already owed the bank. *Id.* The surety sued the bank, claiming that it was entitled to the benefit of the government's progress payment. *Id.*

On appeal, the court held that the federal interest was unaffected by conflicting claims by the surety and the lender to a **progress payment** already made. *Id.* (citing *Martin v. Nat'l Surety Co.*, 300 U.S. 588, 595 (1937)). Thus, the appeals court held state law was the proper source for a dispute between a lender and a surety over payments already made by the government. *Id.* Most importantly, the facts in IMIA's case differ in that it does not involve a **progress payment.** The *Reliance Ins. Co.* court specifically relied on the Supreme Court decision in *Martin* that a federal interest was not involved since *Martin* involved a dispute over a progress payment. IMIA's suit involved a **final payment.** Neither was there any payment directly from the USA to Heller. Unlike *Reliance Ins. Co.*, where neither the government nor the bank was on notice of the fact that the subcontractors had not been paid, the USA was on notice that IMIA had not been paid by BMI and the USA was holding a **final contract payment** as opposed to making a progress payment. The Government, on notice of IMIA's lack of payment, was in the position of being a stakeholder, which is governed by federal law and which subjected USA to longstanding principles of equity derived from federal common law.

Because IMIA's suit involved a final payment, as opposed to a progress payment, and because the *Reliance Ins. Co.* court specifically relied upon *Martin* for its conclusion that no federal interest is involved, the holding in *Reliance Ins. Co.* is inapplicable to this case.

*Reliance Ins. Co.* is also inapplicable because IMIA's suit arises out of a maritime contract to repair a public vessel which is governed by admiralty law in which the federal courts have exclusive jurisdiction. *Southwest Marine of San Francisco, Inc., v. United States*, 896 F.2d 532 534 (Fed. Cir. 1990) (citing *Matson Navigation Co., v. United States*, 284 U.S. 352, 356 (1932) ("jurisdiction over matters arising in admiralty, including maritime contracts, has

traditionally been with the federal district court.")) Moreover, in *Pearlman*, 371 U.S. 132, the

Supreme Court solely addressed awarding an equitable lien to a surety on a "retainage fund" as

opposed to the "progress payment" at issue in *Reliance Ins. Co.* cited by Heller. Pearlman also

held that "laborers and materialmen have a right to be paid out of the retained fund." *Pearlman*,

371 U.S. at 141. *Pearlman* provides a basis for applying federal law to IMIA's claim for an

equitable lien against BMI and Heller.

IMIA's case is further distinguishable from *Reliance Ins. Co.* in that it clearly invokes a

federal interest because it deals primarily with the conduct of the United States in making final

payment to BMI after it was put on notice by IMIA that it had not been paid. The rule of any

decision would govern the primary conduct of the United States. *See O'Melveny & Myers v.

F.D.I.C.*, 512 U.S. 79, 88 (1994).

In *Commercial Trust Co.,* the plaintiff sought to pursue the proceeds of the freights (its

collateral for the loan) into the hands of the defendant, the court commented on the particularly

equitable nature of such a suit. 48 F.2d at 114 (2nd Cir. 1931.) Regarding the maritime nature of

plaintiff's case, the Court in *Commercial Trust Co.,* stated, "the initial maritime character of the

transaction persists, into whatever form the proceeds may go." *Id.* "If that be maritime, the

admiralty assumes all incidents in its collection, including the pursuit of the security into the

hands of one who holds as trustee." *Id.* Following the court's reasoning in *Commercial Trust

Co.,* IMIA has a claim in admiralty to equitably trace or follow the proceeds, paid by the USA, to

BMI upon which it had an equitable lien or interest into the hand of Heller.

Since resolution of the instant case will involve determining whether a federal

subcontractor who has not been paid by the contractor, where no performance bond exists, IMIA

is entitled to an equitable interest in contract funds held in the hands of the Government, and since this Court must decide whether or not the Government is free to make a final payment of contract funds to the general contractor, under the facts of this case, raise a "significant conflict between some federal policy, or interest, and the use of state law." *Id.*, (citing, *Wallis v. Pan American Petroleum Corp.*, 384 U.S. 63, 68 (1966).

## CONCLUSION

IMIA has made the requisite allegations of fact in its Third Amended Complaint to successfully aver a cause of action against the Defendant Heller for an equitable lien upon the proceeds now in the hands of BMI and/or Heller. Therefore, Heller's Motion to Dismiss is due to be denied.

_____/s/_____
Edward J. Baines, Federal Bar No. 06776
Patrick E. Clark, Federal Bar No. 26628
Saul Ewing LLP
100 South Charles St., 16th Floor
Baltimore, Maryland 21201-2773
(410) 332-8600
(410) 332-8185 (fax)

Attorneys for Plaintiff

OF COUNSEL:
I. David Cherniak, Federal Bar No. CHERI8107
Lawrence J. Seiter, Federal Bar No. SEITL4720
Johnstone, Adams, Bailey, Gordon and Harris, LLC
P. O. Box 1988
Mobile, Alabama 36633
Tel.: (251/432-7682)
Fax: (251/432-0712)

CERTIFICATE OF SERVICE

I hereby certify that on this _____ day of September, 2003, copies of the foregoing

were served electronically on:

John P. Amato, Esq.
Hahn & Hessen LLP
488 Madison Avenue
New York, NY 10022

Michael Schatzow, Esq.
Tracey Cohen Paliath, Esq.
Venable LLP
1800 Mercantile Building
2 Hopkins Plaza
Baltimore, MD 21201

Gregg A. Cervi, Esq.
Peter F. Frost, Esq.
Torts Branch, Civil Division
U.S. Department of Justice
P. O. Box 14271
Washington, DC 20044-4271

Richard M. Kremen, Esq.
Jodie E. Buchman, Esq.
Piper Rudnick LLP
6225 Smith Avenue
Baltimore, MD 21209-3600

Thomas DiBagio, Esq.
Thomas Corcoran, Esq.
Office of the U.S. Attorney
6625 U.S. Courthouse
101 W. Lombard Street
Baltimore, MD 21201-2692

_____/s/_____

Patrick E. Clark