IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

| | |
|---|---|
| INTERNATIONAL MARINE & INDUSTRIAL APPLICATORS, INC., an Alabama Corporation, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA, and <br><br> BALTIMORE MARINE INDUSTRIES, INC., and <br><br> HELLER FINANCIAL, INC. <br><br> Defendants. | Case No. MJG-02CV-3542 |

**REPLY MEMORANDUM IN SUPPORT OF MOTION BY HELLER
FINANCIAL, INC. TO DISMISS THE THIRD AMENDED COMPLAINT**

Defendant Heller Financial, Inc. ("Heller"), by its undersigned attorneys, hereby submits this reply memorandum in further support of its Motion to Dismiss the Third Amended Complaint filed by the Plaintiff International Marine & Industrial Applicators, Inc. ("IMIA") (the "Motion to Dismiss").[1]

**I.   IMIA's constructive trust claim should be dismissed**

   **A.   The Assignment of Claims Act and Anti-Assignment Act are not relevant**

In the Opposition to Motion to Dismiss, IMIA incredibly claims that the "Anti-Assignment Act" was not adhered to and precludes the attachment of Heller's security interest in the proceeds. This argument is totally inapposite because the "Anti-Assignment Act," as defined by IMIA is not applicable

---

[1] Unless otherwise defined herein, all capitalized words shall have the meanings ascribed to them in the Motion to Dismiss filed by Heller.

to the present case.[2]  The Assignment of Claims Act has no relevance to Heller's perfection of its security interest in the proceeds of this account receivable.  In fact, Article 9 of the Uniform Commercial Code exclusively governs the issue of perfection and priority of security interests in accounts receivable.  As acknowledged in the Third-Amended Complaint, Heller holds a security interest documented by a financing statement which was properly filed with the Maryland State Department of Assessments and Taxation.[3]

Significantly, IMIA does not challenge Heller's valid perfected security interest in the Third-Amended Complaint.  Even if IMIA did challenge Heller's security interest, the Assignment of Claims Act, as related above, is inapplicable, as a matter of law, to such a challenge.  *See* <u>Provident Hospital & Training Association v. GMAC Mortgage Company of Pennsylvania (In re Provident Hospital & Training Assoc.)</u>, 79 B.R. 374 (Bankr. N.D. Ill. 1987) (debtor unable to challenge secured lender's valid perfected security interest in proceeds from claims against the United States on grounds that lender did not comply with the Assignment of Claims Act); <u>In re Drapery Design Center, Inc.</u>, 86 B.R. 120 (Assignment of Claims Act did not apply to challenge lender's security interest in accounts receivable); <u>Armstrong v. Dakota Western Bank of Bowman (In re Arithson)</u>, 175 B.R. 313, 320 (Bankr. D. N.D. 1994) (anti-assignment provisions not designed to "upset commercial relationships created and defined

---

[2] In the Opposition, IMIA also confuses the situation by incorrectly referring to (the "Anti-Assignment Act") 41 U.S.C. § 15 and (the "Assignment of Claims Act") 31 U.S.C. § 3727 collectively as the "Anti-Assignment Act."  In actuality, 41 U.S.C. § 15 is the "Anti-Assignment Act" and 31 U.S.C. § 3727 is the "Assignment of Claims Act."  For purposes of this Reply, Heller will refer to both Acts collectively as the "Assignment of Claims Act."

2

by state law"); In re George, 119 B.R. 800, 802 (D. Kan. 1990) (anti-assignment provisions cannot be used "to avoid a properly perfected security interest").

The Assignment of Claims Act was enacted for the protection of the "federal government against frauds and a multiplicity of conflicting claims. It was not promulgated to regulate the equities existing between individual claimants." Wasserman v. Alexander (In re Drapery Design Center, Inc.), 86 B.R. 120, 123 (Bankr. N.D. Ohio 1988). *See also* 41 U.S.C. § 15; In re Provident Hospital & Training Assoc., 79 B.R. 374. Accordingly, even presuming that a violation of the Assignment of Claims Act did occur (which was not alleged in the Third-Amended Complaint by IMIA or by the USA), such a cause of action would belong exclusively to the USA. *See* In re Provident Hospital & Training Assoc., 79 B.R. at 380-81.

### B. IMIA does not state a claim for constructive trust against Heller

IMIA's claim of a constructive trust is based upon Maryland state law, yet IMIA cites no Maryland case in which a secured lender has been required to disgorge a payment received from the government where the secured lender committed no wrongful conduct in connection with its receipt of such payment. The reason why no such case is cited is because no such Maryland law exists. In fact, the only Maryland case law that addresses this issue holds that a secured lender is entitled to keep payments received from the government if they were made prior to the contractor defaulting under the

---

[3] Heller's lien is also now established since no timely objections or other pleadings were filed with the Bankruptcy Court to the Second Interim Agreement and Consent Order Authorizing Debtor to use Cash Collateral and Granting Adequate Protection and Final Order Approving First Interim Agreement and Consent Order Authorizing Use of Cash Collateral and Granting Adequate Protection (the "Cash Collateral Order") entered by the Bankruptcy Court on June 27, 2003. In particular, paragraph 19 of the Cash Collateral Order provided that all parties in interest had until August 11, 2003 (45 days from the date of entry of the Cash Collateral Order) to file an objection to Heller's lien. If no objections were filed, Heller was "deemed to hold allowed, perfected, enforceable and non-avoidable secured interests in the Prepetition Collateral." *See* Cash Collateral Order at ¶ 19. IMIA did not file an objection to the Cash Collateral Order.

government contract. *See* Finance Company of America v. United States Fidelity and Guaranty Company, 277 Md. 177, 185-86 (1976) (while a surety has a higher priority than a secured lender to a contract payment in the hands of the government <u>after</u> the contractor defaults, the secured lender's lien attaches to all payments due from the government entitling the secured lender to retain monies paid by the government prior to the contractor's default). Not surprisingly, there are numerous decisions from other jurisdictions reaching the save result. *See e.g.,* The National Shawmut Bank of Boston v. New Amsterdam Casualty Co., 411 F.2d 843, 847-48 (1st Cir. 1969) (where the court collected case law from several jurisdictions that draws a bright line between those government contract payments that are made and received by a secured lender <u>before</u> a contractor defaults and those that are to be made <u>after</u> the contractor defaults).

Given this absence of relevant case authority, IMIA seeks to obscure this problem by directing the court to the general Maryland case law setting forth the unremarkable legal proposition that a party may be forced to disgorge property under constructive trust principles where **that** party (a) acquired the property through fraud, duress, undue influence, mistake or through a breach of fiduciary duty, or (b) would be unjustly enriched if permitted to retain the property. IMIA Memo at 3, citing Wimmer v. Wimmer, 287 Md. 663, 668 (1980), a case cited in Heller's initial moving papers. Even these general principles of law cannot save IMIA's constructive trust claim in this case.

IMIA admits throughout its opposition papers that there are no facts that would support any wrongful conduct on Heller's part when it states that it is not aware how Heller came to be in possession of all or part of the Change Order Request Proceeds once USA paid them over to BMI. Nevertheless, IMIA still argues that it should be entitled to the benefits of a constructive trust because of **BMI's** alleged wrongful conduct and IMIA's assertion that **BMI** would be unjustly enriched if Heller is

permitted to keep the monies in Heller's possession.  IMIA's view that Heller's conduct or equitable standing is irrelevant to IMIA's constructive trust claim is simply incorrect, as a matter of well-established Maryland constructive trust law.

The Maryland law requirement to focus on Heller's conduct and equitable position – and not BMI's – is illustrated by a detailed analysis of Starleper v. Hamilton, 666 A.2d 867 (Md. 1995), another case cited by Heller in its moving papers, but misapplied by IMIA.  As further described in Heller's Motion to Dismiss, Starleper requires the dismissal of IMIA's constructive trust claim because IMIA has failed to allege wrongful conduct by **Heller**, or facts supporting that **Heller** would be unjustly enriched if it is permitted to retain the monies.  *See* Motion to Dismiss at pp. 5-6.  IMIA sets forth no allegations in the Third-Amended Complaint that allege that Heller engaged in wrongful conduct.  Furthermore, IMIA sets forth no allegations to suggest that Heller would be unjustly enriched from its receipt of the funds and application to BMI's loan balance.  *See* Third-Amended Complaint.

The facts alleged by IMIA in all versions of its Complaint, and as to which this Court may take judicial notice, are fatal to IMIA's constructive trust claim against Heller.  Heller has done nothing improper, and it would not, as a matter of law, be unjustly enriched if it is permitted to apply the proceeds of its collateral.  Heller's rights to the proceeds of its collateral were documented and perfected well before BMI even hired IMIA as a subcontractor to perform work on the RESOLUTE.  IMIA, therefore, knew or should have known that Heller had superior rights to the proceeds.  In addition, unlike the second wife in Starleper, whose loan did not benefit the minor child one iota, Heller made millions of dollars of loans to BMI enabling it to perform government contracts and pay subcontractors, including IMIA.  Thus, IMIA received a tangible economic benefit from Heller's loans.

IMIA's reliance on Starleper is also grossly misplaced given the stark differences between the facts in that case and those presented to this Court. The Starleper facts clearly paint an equitable landscape that cried out for the imposition of a constructive trust to protect a minor child. Here, IMIA is not a "babe in the woods" that needs such protection. To the contrary, BMI first contracted with and granted a security interest to Heller well before BMI hired IMIA as a subcontractor. Moreover, IMIA, which is a sophisticated commercial entity, knew or had reason to know of Heller's security interest and lien. IMIA chose with open eyes to extend credit in the face of Heller's fully disclosed and well-documented rights. It is remarkable that IMIA tries to analogize itself to the minor child in Starleper that was in need of protection against the breach of an express agreement that pre-dated the second wife's alleged loan.

IMIA further mistakenly asserts that it is entitled to imposition of a constructive trust because there was a "confidential relationship" between IMIA and **BMI.** IMIA alleges no credible facts to support this claim. Moreover, IMIA does not contend, nor could it contend, that there was a confidential or fiduciary relationship between IMIA and Heller. While Maryland courts have recognized that the existence of a confidential relationship between the parties might justify imposition of a constructive trust, they have only recognized this principle in cases where the confidential relationship is between the wrongdoer and the party claiming entitlement to the funds. *See* Carter v. Abramo, 201 Md. 339, 93 A.2d 546 (1953); Wenger v. Rosinsky, 232 Md. 43, 192 A.2d 82 (1963). IMIA fails to allege that there was a confidential relationship between Heller and IMIA, nor are there any allegations of wrongdoing on the part of Heller. Accordingly, the cases cited by IMIA in its opposition are completely inapposite to the present case.

Given the absence of any other Maryland case law to support its state law constructive trust claim against Heller, IMIA has chosen to rely upon federal "equitable lien" law to try to support IMIA's bald allegation that Heller would be unjustly enriched if it is permitted to apply the proceeds of its collateral. According to IMIA, the United States Supreme Court's decision in Pearlman v. Reliance Ins. Co., 371 U.S. 132, 136 (1962) stands for the proposition that Heller's lien never attached to the proceeds that are now in its possession. Pearlman stands for no such proposition.[4]

The Pearlman decision has no relevance to the situation at hand because it did not involve the rights of a secured creditor to apply monies paid by the government prior to a default by the contractor. *See* The National Shawmut Bank, 411 F.2d at 847-48 (where the United States Court of Appeals for the First Circuit juxtaposed a Pearlman post-default situation against the rights of an assignee bank to keep earned progress payments paid to the assignee bank prior to a contractor default). In fact, Pearlman does not even involve a secured lender, such as Heller, an unsecured subcontractor, such as IMIA, or a government contractor, such as BMI that has fully performed its government contract. Instead, Pearlman involved a priority dispute between a surety and a trustee in bankruptcy over retainage monies held by the government after a contractor defaulted.

IMIA's brief blatantly fails to recognize the distinction between the priorities to be accorded retainage monies in the hands of the government after a contractor defaults and government payments made before a contractor defaults. This distinction is fully recognized in cases such as National Union Fire Ins. Co. of Pittsburgh, PA . v. The United States Terre Haute First National Bank,, 304 F.2d 465

---

[4] As stated above, there is also no Maryland case that stands for such a proposition. To the contrary, Maryland's Court of Appeals has already indicated that a secured lender's lien does attach to the monies due from the government, but that the secured lender's lien will have a lower priority than the rights of a surety to recover a payment that is due from the government after the contractor defaults. Finance Company of America, 277 Md. at 185-86.

(Ct. Cl. 1962) and American Fidelity Co. v. National City Bank of Evansville, 266 F.2d 910, 915-16 (D.C. Cir. 1959) that were cited by Heller in its initial motion papers.  In both of those cases, **which do involve the resolution of a secured lender's right to keep contract payments made prior to the contractor's default**, the secured lenders prevailed over the disgorgement claims of a surety because (a) the secured lenders committed no wrongful conduct, (b) the secured lenders' liens attached to the proceeds paid by the government, and (c) the proceeds were paid by the government prior to the contractor defaulting.  National Union, 304 F.2d at 469; American Fidelity, 266 F.2d at 915; *see also* Reliance Insurance Co. v. U.S. Bank of Washington, N.A, 143 F.3d 502, 507 (9th Cir. 1998) (where the court also ruled in favor of a secured lender because "[t]his is not a case where the lender, in a dishonest transaction, collected money from the government with knowledge that the contractor had promised the surety to pay it into a fund for laborers and materialmen ahead of the lender").

      IMIA tries to distinguish National Union and American Fidelity by arguing they involve a surety, not a subcontractor, and the payment at issue in such cases involved ordinary progress payments as opposed to a progress payment related to a change order, as in the instant case.  These are distinctions without a difference.  First, a surety possesses a bundle of rights that are much greater than those of any individual subcontractor, as is made clear by the Pearlman decision.  If a surety's claims cannot defeat a secured lender's claims to keep payments made prior to a default by the contractor, then neither should the unsecured subcontractor that has less rights.  Moreover, progress payments are ordinary course payments in the surety context.  Finally, the precise type of payment that is made by the USA is not the relevant factor.  Instead, the relevant factor is when the payment is made and whether the contractor is in default under the government contract at the time the payment was or is to be made.  *See, e.g.,* Finance Company of America, 277 Md. at 185-86 (where Maryland Court of Appeals held a surety

has priority as to payments to be made after a contractor defaults). Here, BMI did not default and was paid the monies freely by the USA. Heller, as BMI's secured lender, had every right to apply those funds received from BMI in accordance with the terms of its loan documents. Reliance Ins., 143 F.3d at 507; National Union, 304 F.2d at 469; American Fidelity, 266 F.2d at 915.

## II.     IMIA had no maritime lien on the funds in the hands of the USA

IMIA asserts that valid maritime liens have priority over a perfected Article 9 security interest. This assertion is immaterial since (a) IMIA does not have a **valid** maritime lien for the reasons set forth in the USA's motion to dismiss, and, in any event, (b) the monies paid by the USA were general public funds that were not the proceeds of any maritime lien. *See, e.g.,* Department of the Army v. Blue Fox, Inc., 525 U.S. 255, 263 (1998) ("sovereign immunity bars creditors from attaching or garnishing funds in the Treasury"). Thus, since general government funds are involved, IMIA never had any lien on such funds and does not have the right to sue the USA in this matter to force it to pay IMIA directly for having paid out general funds to BMI. *See, e.g.,* United States v. Munsey Trust Co., 332 U.S. 234, 241 (1947) ("laborers and materialmen do not have enforceable rights against the United States for their compensation").

As previously pointed out in Heller's initial memorandum, even if the Court were to assume that IMIA may have had a valid maritime lien on the proceeds that were paid by the USA, that does not mean that IMIA has the right to trace the funds into Heller's hands and force it to disgorge those funds to IMIA. Even if there was a valid maritime lien on the funds, IMIA would only be able to force disgorgement if Heller committed some wrong to obtain possession of the funds or would be unjustly enriched if it is permitted to apply the funds. Since, as noted above, that is not the case, even if IMIA

had a valid maritime lien on the funds, Heller is entitled to apply these funds since IMIA's constructive trust claim and ability to trace the funds into Heller's hands is meritless.

### III.   IMIA has no viable equitable lien claim

IMIA admits that Maryland common law fails to provide it with any rights to the funds in Heller's hands under any state law equitable lien theory.  This is not surprising since there is no Maryland case law that provides for the imposition of any equitable lien against government contract payments tendered to an innocent secured lender prior to a default under a government contract.  *See* Finance Company of America, 277 Md. at 186 (a secured lender's lien attaches to government contract payments made before a default under that contract); *see also* Scott & Wimbrow, Inc. v. Calwell, 31 Md. App. 1, 6 (Ct. Spec. App. 1976) ("'there can be no existing [equitable] lien on property until and unless the claimant prevails either in a suit to enforce the claimed lien or in some other appropriate proceeding providing for notice and a hearing (i.e., a declaratory judgment action)'").  Accordingly, since the monies were paid out by the USA before BMI defaulted and were received by Heller and applied before this action was commenced, the monies applied by Heller were never impressed with any state law equitable lien in IMIA's favor.

It is precisely because state law is unavailing that IMIA has determined to disregard state law and claim that its "equitable lien" arises under federal law.  It should be pointed out that IMIA's claim that federal law should provide the rule for decision is incorrect.  Reliance Ins. Co., 143 F.2d at 505 (where the United States Court of Appeals for the Ninth Circuit applied state, not federal law, to a priority dispute since the "federal interest is unaffected by conflicting claims by the surety and the lender to a progress payment already made" by the government).  In any event, federal law is fully consistent with Maryland law in holding that there is no equitable lien that can be used to force a secured lender to

disgorge payments received prior to the contractor defaulting on a government contract. Compare American Fidelity, 266 F.2d at 915 with Finance Company of America, 277 Md. at 186.

Pearlman, and the cases that have followed it, some of which IMIA cites in its brief, are not helpful to IMIA since they do not involve the resolution of a secured lender's right to keep payments made by the government prior to the contractor defaulting under the relevant government contract. For instance, IMIA cites to Universal Bonding Ins. Co. v. Gittens & Sprinkle Enterprises, Inc., 960 F.2d 366 (3d Cir. 1992) and Matter of RAH Development Co., 184 B.R. 525 (Bankr. W.D. Mich. 1995) in support of its equitable lien claim. Unlike the present situation, where the USA paid BMI under a government contract that was not in default and Heller received the proceeds of its collateral, in both Universal Bonding and RAH Development the courts addressed competing property claims to funds retained by the government, which funds had not been paid to any party as a result of the contractor's default.

Similarly, IMIA's reliance on U.S. v. TAC Const. Co., 760 F. Supp. 590 (S.D. Miss. 1991) and Active Fire Sprinkler Corp. v. Untied States Postal Service, 811 F.2d 747 (2d Cir. 1987) is also misplaced, as they also address the situation of competing claims concerning retained funds being held by the government after a contractor's default. Here, the proceeds were not retained by the government, but were freely paid by the USA and then given to Heller pursuant to its perfected security interest in BMI's accounts receivable entitling Heller to apply them under the terms of its loan documents. *See, e.g.,* American Fidelity, 266 F.2d at 915-16 (where progress payments made by government were paid to bank, as assignee of the contractor, the mechanics and materialmen "never had any legal or equitable rights to the proceeds of the contract and so had no right to recover the progress payments from the assignee bank").

**IV.**     **Conclusion**

For the foregoing reasons, and those previously stated in Heller's initial moving papers, it is respectfully requested that the Court grant Heller's motion to dismiss the Third Amended Complaint.

                                            Respectfully submitted,

DATED: September 29, 2003                    /s/    Jodie E. Buchman
                                            Richard M. Kremen (Bar No. 00532)
                                            Jodie E. Buchman (Bar No. 26004)
                                            Piper Rudnick LLP
                                            6225 Smith Avenue
                                            Baltimore, Maryland 21209
                                            (410) 580-3000

                                            Attorneys for Defendant Heller Financial, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of September, 2003, a copy of the foregoing Reply Memorandum in Support of Motion by Heller Financial, Inc. to Dismiss Third Amended Complaint was sent by electronic mail and/or first class mail to the following:

Edward J. Baines
Patrick E. Clark
Saul Ewing LLP
100 S. Charles Street
Baltimore, Maryland 21201

Karen H. Moore
Whiteford, Taylor & Preston L.L.P.
7 St. Paul Street
Baltimore, MD  21202-1626

Michael Schatzow
Tracey Cohen Paliath
Venable Baetjer and Howard LLP
Two Hopkins Plaza, Suite 1800
Baltimore, Maryland 21201

Robert D. McCallum, Jr.
Thomas M. Dibiagio
Thomas F. Corcoran
6625 United States Courthouse
101 W. Lombard Street
Baltimore, Maryland 21201

Gregg A. Cervi
Peter F. Frost
Torts Branch, Civil Division
U.S. Department of Justice
P.O. Box 14271
Washington, D.C. 20044-4271

                                                          /s/   Jodie E. Buchman
                                                             Jodie E. Buchman