IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

INTERNATIONAL MARINE &          *
INDUSTRIAL APPLICATORS, INC.
                                *
        Plaintiff
                                *
        vs.                          CIVIL ACTION NO. MJG-02-3542
                                *
UNITED STATES OF AMERICA, et al.
                                *
        Defendants
*        *        *        *        *        *        *        *        *

MEMORANDUM AND ORDER

The Court has before it the United States' Motion to

Dismiss [Paper 46], the Motion by Defendant Heller Financial,

Inc. to Dismiss the Third Amended Complaint [Paper 51], and

the materials submitted by the parties related thereto.  The

Court finds a hearing unnecessary.


I.    BACKGROUND[1]

As discussed herein, the instant lawsuit arises out of a

Government contract, whereby Defendant Baltimore Marine

Industries, Inc. ("BMI") was to furnish repairs to the U.S.S.

RESOLUTE (the "RESOLUTE"), a vessel owned and operated by the

United States Navy.  Plaintiff International Marine and

_____

[1]    Unless otherwise indicated, the facts set forth
herein are undisputed or stated in the light most favorable to
IMIA.

Industrial Applicators, Inc. ("IMIA") subcontracted with BMI to undertake certain work on the RESOLUTE.  IMIA performed on its subcontract but has not been paid for its services.

On September 9, 2000, BMI (as prime contractor, with the United States' consent) engaged IMIA to perform a number of tasks, including coating and cleaning the RESOLUTE.  Third Am. Compl. ¶¶ 8-10.  IMIA successfully completed its work, including certain additional tasks, and submitted to BMI an invoice for $2,181,398.12 (the "Change Order Request") which BMI passed on to the United States.  Id. ¶ 13.  In or about October of 2002, the Government agreed to pay BMI a total sum in excess of the amount due IMIA[2] ("the Total Amount") from which BMI was to pay IMIA and other subcontractors for their services.  Id. ¶ 17-18.

At some point prior to October 9, 2002, Defendant Heller Financial, Inc. ("Heller") had extended a loan to BMI to enable it to perform its Government contract obligations and pay subcontractors.  As collateral for the loan, Heller claimed an interest in the proceeds from all of BMI's accounts, including amounts due from the United States.  Mem

---

[2]     The record does not indicate the precise Total Amount but it must have been in excess of $2,181,398.12 since it was more than adequate to pay that amount.

2

in Supp. of Mot. by Def. Heller to Dismiss the Third Am. Compl., at 2-3.

On or about October 9, 2002, the United States delivered to BMI payment of the Total Amount. Id. ¶ 18. However, pursuant to purported authority under its loan agreement, Heller asserted control over the Total Amount and prevented IMIA from obtaining the $2,181,398.12 it was owed. Third Am. Compl. ¶ 19.

IMIA sues BMI, the US, and Heller to recover the $2,181,398.12 it is owed. IMIA asserts the following claims:

| Count | Theory of the Claim | Parties Allegedly Liable |
|---|---|---|
| Count I | IMIA has a "maritime lien" on United States property, the RESOLUTE, under the Suits in Admiralty Act 46 U.S.C. 741 et seq. | United States |
| Count II | under Maryland law, BMI breached its contract with IMIA | BMI |
| Count III | IMIA performed work for BMI, for which it was not compensated, and now seeks restitution under Maryland law | BMI |
| Count IV | under Maryland law and to prevent inequity, BMI held the disputed funds in "constructive trust" for IMIA (such that Heller's security interest never attached to these funds) | BMI, Heller |
| Count V | IMIA has a maritime lien, under the SAA, on the proceeds stemming from work performed on the RESOLUTE, which proceeds BMI and Heller control | BMI, Heller |

3

| Count VI | under federal law, as an uncompensated government subcontractor, IMIA has an "equitable lien" on funds received in connection with work performed on the RESOLUTE | BMI, Heller |
| Count VII | under federal law, as an uncompensated government subcontractor, IMIA has an equitable lien on funds paid out in connection with work performed on the RESOLUTE | United States |

Id. ¶¶ 22-54.

With respect to its claims under state law (Counts II, III, and IV), IMIA seeks to evoke the diversity jurisdiction of this Court per 28 U.S.C. § 1332. Id. ¶ 6. This is inappropriate so long as the Government is a party to the case.[3] Nevertheless, because the state law claims are part of the same "case or controversy" as federal law claims

---

[3]    The United States is not a "citizen of a different state" within the meaning of § 1332. Texas v. Interstate Commerce Comm'n, 258 U.S. 158, 160 (1922); Koppers Co., Inc. v. Garling & Langlois, 594 F.2d 1094, 1097 n.1 (6th Cir. 1979); E. Indem. Co. of Md. v. J.D. Conti Elec. Co., Inc., 573 F.Supp. 1036, 1039-1040 (E.D. Va. 1983). Thus, there is not "complete diversity" in this case, as would be required to ground diversity jurisdiction. See Strawbridge v. Curtiss, 7 U.S. 267 (1806).

asserted,[4] the Court has supplemental jurisdiction to

adjudicate Counts II-IV under 28 U.S.C. § 1367.

The United States moves to dismiss the claims against it,

Counts I and VII, on the grounds that:

> 1.  The Court lacks subject matter jurisdiction over
>     these claims, inasmuch as the US is a sovereign
>     that has not waived its immunity to IMIA's suit;
>     and
>
> 2.  IMIA has failed to state any viable claim.

Heller moves to dismiss the claims against it Counts IV,

V, and VI, on the ground that IMIA has failed to state any

viable claim.


II.    LEGAL STANDARDS GOVERNING DISMISSAL

A.   Subject Matter Jurisdiction (Sovereign Immunity)

The United States cannot be sued without its consent.

United States v. Lee, 106 U.S. 196, 204 (1882).  Absent

consent, the doctrine of sovereign immunity bars the Court

from exercising jurisdiction where the United States is a

defendant and thus mandates dismissal of claims against the

US.  Fed. R. Civ. P. 12(b)(1) (2003).

---

[4]    State and federal claims are part of the same "case"
where, as here, they stem from the same nucleus of operative
facts.  United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725
(1966).

5

The United States' consent to be sued is derived from acts of Congress that waive sovereign immunity.  <u>United States v. Shaw</u>, 309 U.S. 495, 502 (1940).  The United States appears herein to concede, as it must, that it has waived its sovereign immunity in senses generally pertinent to this case.  Mem. in Supp. of the US' Mot. to Dismiss, at 3 (immunity is waived for certain maritime suits); US' Reply to Pl.'s Opp'n to US' Mot. to Dismiss, at 8 (immunity is waived for certain government contract-related actions).

Accordingly, the Court must consider whether Plaintiff has alleged facts that, if proven, would support claims falling within the parameters of such immunity waivers.  <u>See</u> 5A Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1350 at 218-19 (2d ed. 1990) (where subject matter jurisdiction is challenged, complaint allegations must be accepted as true and liberally construed, but argumentative inferences should not be drawn in favor of the pleader).

### B.    <u>Failure to State a Claim</u>

The Court must deny a Motion to Dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure unless it "appears beyond  doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  <u>Conley v. Gibson</u>, 355 U.S. 41,

45 - 46 (1957).  "The question is whether in the light most favorable to the Plaintiff, and with every doubt resolved in his behalf, the Complaint states any valid claim for relief."  5A Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1357 at 336 (2d ed. 1987).  The Court, when deciding a motion to dismiss, must consider the well-pled allegations in a complaint as true and must construe those allegations in favor of the Plaintiff.  <u>Jenkins v. McKeithen</u>, 395 U.S. 411, 421-22 (1969).  The Court must further disregard the contrary allegations of the opposing party.  <u>A.S. Abell Co. v. Chell</u>, 412 F.2d 712, 715 (4th Cir. 1969

III.  <u>DISCUSSION</u>

 A.  <u>The Maritime Lien Claims (Counts I and V)</u>

 IMIA seeks to enforce maritime liens against the United States (<u>i.e.</u>, a legal interest in the RESOLUTE) and against Heller (<u>i.e.</u>, a legal interest in the proceeds of work performed on the RESOLUTE).  Third Am. Compl. ¶¶ 23-24, 38.  IMIA claims it is entitled to these liens "under provisions of the Suits in Admiralty Act" ("SAA").  <u>Id.</u> ¶¶ 22-23, 37.

 The SAA provides, in pertinent part:

> In cases where if [a] vessel [at issue] were privately owned or operated... or if a private person or property were involved, a proceeding in admiralty could be maintained, any appropriate nonjury proceeding in personam may

7

be brought against the United States[.]

46 U.S.C. § 742 (2003).  Section 742 clearly waives sovereign

immunity with respect to admiralty proceedings (including,

inter alia, assertions of maritime liens).[5]  Thus, were IMIA

to present a valid claim in admiralty against the United

States, the Court likely would have subject matter

jurisdiction.

Counts I and V, however, state no valid admiralty claims

– neither against the United States nor against Heller –

because IMIA fails to articulate a substantive legal basis for

its alleged maritime liens.

The SAA, inappropriately cited by Plaintiff as the basis

for its liens, does not, in and of itself, establish

substantive rights or property interests.  Rather, the SAA

merely waives sovereign immunity to confer upon the federal

courts jurisdiction over certain admiralty proceedings.  The

substantive bases for SAA claims must stem from other

provisions of admiralty law.  Manuel v. United States, 50 F.3d

1253, 1255 n.1 (4th Cir. 1995); Hodnett v. United States, No.

_____

[5]      Courts have, for years, considered actions to
        enforce
maritime liens to be "proceedings in admiralty" within the
meaning of the SAA.  E.g., Hopeman Bros., Inc. v. USNS
Concord, 898 F.Supp. 338, 339 (E.D. Va. 1995); In re The
Liberator, 5 F.2d 585 (4th Cir. 1925).

03-183, slip op. at 2, (E.D. Va. Aug. 11, 2003); <u>Nelson v.</u>
<u>United States</u>, 639 F.2d 469, 473 (9th Cir. 1980).  In practical
effect, the SAA is to admiralty law what 42 U.S.C. § 1983 is
to civil rights law: a procedural vehicle to enforce federal
rights elsewhere articulated.

IMIA nowhere refers to any substantive provision of law
giving rise to its purported lien rights.  In their papers,
the parties argue at great length about the Maritime
Commercial Instruments and Lien Act ("MCILA").[6]  They seem to
agree: 1) that MCILA affords particular lien rights, but 2)
that these right do not apply to "public vessels," such as the
RESOLUTE.  Mem. in Supp. of the US' Mot. to Dismiss, at 4;
Mem. in Supp. of Mot. by Def. Heller to Dismiss the Third Am.
Compl., at 8-9; [Pl.'s] Mem. in Resp. to the US' Mot. to
Dismiss, at 5-8.  IMIA subsequently notes that MCILA, while
not providing a pertinent lien right, does not preclude the

---

[6]     MCILA, 46 U.S.C. § 31342, provides:
        Establishing maritime liens.
        (a) Except as provided in subsection (b)
        of this section, a person providing
        necessaries to a vessel on the order of the
        owner or a person authorized by the owner --
            (1) has a maritime lien on the vessel
            [and]
            (2) may bring a civil action in rem to
            enforce the lien...
        (b) This section does not apply to a
        public vessel.

assertion of such a right.  Id., at 8.  This may be so, but
the fact remains that Plaintiff has not indicated what, if
any, law gives rise to the property interest it seeks to
vindicate.

With respect to Counts I and V, IMIA relies upon only a
jurisdictional statute and a statute that, purportedly, does
not itself defeat its suit.  These authorities do not support
IMIA's claim.  To avoid dismissal, a plaintiff must give
defendants some notice of a provision of law (a statute,
common law doctrine, etc.) that affirmatively and
substantively supports its position.  See Conley v. Gibson 355
U.S. 41, 47-48 (1957) (defendants must have meaningful notice
of a claim and a fair opportunity to respond).  IMIA has not
done so, and there appears to be no such provision.
Accordingly, Counts I and V shall be dismissed.[7]


B.   The Constructive Trust Claim (Count IV)

IMIA evokes the doctrine of constructive trusts against
Heller and BMI.  IMIA contends that when BMI received the
October 9 payment from the United States, BMI held
$2,181,398.12 of the Amount in "constructive trust" for IMIA,

_____

[7]     In view of the absence of a valid claim under Count
V, all Defendants, including BMI, are entitled to dismissal of
this Count.

so that this amount was the property of IMIA which Heller could not rightfully obtain pursuant to its security agreement with BMI.  Third Am. Compl. ¶¶ 32-33.

Maryland state law governs the creation and enforcement of constructive trusts.  The doctrine of constructive trusts stems from principles of equity and is designed to confer property rights to the person "who in good conscience should reap the benefits of the possession of said property."  <u>Wimmer v. Wimmer</u>, 414 A.2d 1254, 1258 (Md. 1980).  However,

> [b]efore [a] court [should] impose a
> constructive trust, there must be clear and
> convincing evidence not only of wrongdoing in
> the acquisition [of property], but also of the
> circumstances that render it inequitable for
> the holder of [said property's] legal title to
> retain the beneficial interest [thereof].

<u>Doe v. Doe</u>, 712 A.2d 132, 164 (Md. Ct. Spec. App. 1998) <u>rev'd on other grounds</u>, 747 A.2d 617 (Md. 2000); <u>see also Wimmer</u>, 414 A.2d at 1258.  Thus, in accordance with <u>Doe</u> and <u>Wimmer</u>, there generally are two necessary and distinct elements to an enforceable constructive trust: 1) a wrongdoing relating to an acquisition, by a party other than the plaintiff, of the property at issue; and 2) relative inequity resulting from the

current titleholder,[8] rather than the plaintiff, enjoying the benefits of this property.

### 1.  Wrongdoing in Acquisition

IMIA has alleged wrongdoings that, if established, would support Count IV, for example BMI's "misrepresentation" to the United States that October 9 funds would be delivered to IMIA upon BMI's receipt.  Third Am. Compl. ¶ 34.  It is not necessary that IMIA establish Heller contributed to BMI's wrongdoings.  Starleper v. Hamilton, 666 A.2d 867, 869-71 (Md. Ct. Spec. App. 1995).  The "imposition of [a constructive] trust is not necessarily dependent on a finding that the person whose property is subjected to it has committed some impropriety[.]"[9]  Id., at 869.

Moreover, the wrongdoing(s) in acquisition need not constitute any specific crime or tort, but need only comprise

---

[8]    The Court assumes, for purposes of adjudicating Heller's Motion, that Heller is the current titleholder of the disputed funds.

[9]    IMIA reads the appellate court's holding in Starleper more broadly, to completely eliminate the "wrongdoing" element from constructive trust doctrine.  Pl.'s Mem. in Opp'n to the Mot. to Dismiss of Def. Heller, at 5.  Because such a reading of Starleper is not warranted from the decision's text, and because such a ruling would flout the controlling precedent of the Maryland high court in Wimmer (subsequently affirmed in Doe), the Court does not share Plaintiff's interpretation.

conduct giving rise to unfairness or injustice.  Id., at 869-71.

Plaintiff has adequately alleged wrongdoing that, if established, could be found to give rise to unfairness or injustice.


2.    Inequity of the Titleholder's Retention

On Plaintiff's alleged facts, the Court could possibly find it more equitable for IMIA, rather than Heller, to possess the disputed funds.

Heller, citing Maryland Court of Appeals precedent,[10] suggests a rule for balancing the equities between titleholder and plaintiff, where the current titleholder is a secured creditor of a third-party that wrongfully acquired the property:  The creditor should keep the property if it received the property prior to any allegation or evidence that the third-party wrongfully acquired it.[11]  Mem in Supp. of Mot. by Def. Heller to Dismiss the Third Am. Compl., at 7.

--------

[10]    Finance Co. of Am. v. United States Fid. & Guar. Co.,
353 A.2d 249, 254 (Md. 1976)

[11]    The Court assumes, as Plaintiff alleges, that BMI wrongfully acquired the disputed funds (and transferred them to Heller).

13

Heller's position is consistent with more general principles of equity and property law relevant hereto. <u>See, e.g., Williams v. Skyline Dev. Corp.</u>, 288 A.2d 333, 353 (Md. 1972) (a purchaser of real property without notice of prior interests in that property is a "bona fide purchaser," whose own interests are protected by law; citations are omitted); <u>Bank of Glen Burnie v. Loyola Fed. Sav. Bank</u>, 648 A.2d 453, 459 (Md. 1994) (a holder of commercial paper without notice of a claim against that paper is a "holder in due course" whose interests are protected); Md. Code Ann., Com. Law I §§ 1-201(9), 2-403 (2003) (the interests of a buyer of goods are protected where that person buys the goods "in good faith without knowledge that the sale violates the rights of another"). Accordingly, in assessing the equities of affording IMIA relief, the Court should consider whether Heller had any notice - actual or constructive - of the infirmities in BMI's claim to the disputed funds.[12] The Court should also consider whether Heller had such notice prior to the creation, attachment, and perfection of the purported

---

[12]    <u>I.e.</u>, the Court should inquire whether Heller knew or should have known of any such infirmities - which may include, for example, BMI's indebtedness to IMIA and its alleged statement to the US that $2,181,398.12 would be conveyed promptly to Plaintiff.

14

security interest.[13]  In any event, in the present Rule 12(b)(6) context, Plaintiff IMIA can avoid dismissal so long as it does not appear beyond doubt that it will fail to prove facts that would entitle it to relief.

IMIA has alleged events and circumstances that, if proven, might be found to have given Heller pre-receipt notice of BMI's questionable claim to the disputed funds.  For example, particularly if BMI's communications to the United States (see supra note 11; Third Am. Compl. ¶ 34) prove to have been transparent and readily accessible, it may be found that Heller knew, or should have known, of IMIA's non-frivolous claim to these funds.  Such notice might be found sufficient[14] to render it equitable for a constructive trust to be imposed on the $2,181,398.12 at issue.

---

[13]   In any subsequent briefing on this claim, Heller and IMIA should address which of these events (creation, attachment, and perfection) is most pertinent – i.e., the respective impacts on Count IV of Heller having notice prior to: 1) entering the security agreement with BMI; 2) BMI possessing the disputed funds; and 3) Heller asserting possession or control over said funds.

[14]   Of course, the finder of fact may not find the facts as IMIA wishes.

3.   <u>Traceability of the Disputed Funds</u>

It appears that in order to impose a constructive trust over funds, the funds at issue must be <u>traceable</u> to those funds that had been wrongfully diverted.  In the instant case, this means that the funds subject to the constructive trust must be precisely the same funds that should have been paid to IMIA or funds fairly connected thereto.

The doctrine of constructive trusts is based on rights to property – which rights precede or otherwise preempt transactions involving that property.  The doctrine is not based on any "preference" of a wronged plaintiff in a hierarchy of creditors.[15]  <u>Brown v. Coleman</u>, 566 A.2d 1091, 1097-98 (Md. 1989) (citations omitted); <u>see also Englar v. Offutt</u>, 16 A. 497, 499 (Md. 1889) ("The true owner of a fund traced to the possession of another has a right to have it restored, not as a debt due and owing, but because it is his property wrongfully withheld from him[]").  Because

---

[15]    Indeed, if it were, enforcing a constructive trust in favor of an non-secured creditor (such as IMIA) over a secured creditor (such as Heller) would eviscerate the law of secured transactions codified at Md. Code Ann., Com. Law I § 9-101 <u>et seq.</u> (Maryland's version of Uniform Commercial Code Article 9) and undermine the policies encouraging secured loans embodied therein.  The beneficiaries of such secured loans, of course, may well include subcontractors.

16

constructive trusts reflect an interest in a specific property, they may only be imposed on that specific property or on property traceable thereto.  <u>Brown</u>, 566 A.2d at 1097-98

A plaintiff seeking a constructive trust over funds must ultimately prove that they are traceable to its deprivation. However, it suffices, to avoid dismissal, that IMIA has specifically alleged that the $2,181,398.12 that was "earmarked" for payment to IMIA is in Heller's possession. <u>E.g.</u>, Third Am. Compl. ¶ 35.  Of course, it remains to be seen whether IMIA can produce evidence adequate to meet its tracing obligation.

Accordingly, the constructive trust claims in Count IV shall not be dismissed.


    C.   <u>The Equitable Lien Claims (Counts VI and VII)</u>

IMIA, relying upon the federal law of government contracts, seeks to enforce equitable liens against the United States and Heller.  By virtue of its status as an unpaid subcontractor, IMIA claims an interest in funds paid out by the United States (now, allegedly, in Heller's possession) in consideration for repairs performed on the RESOLUTE.

17

Under IMIA's theory, the United States was a "stakeholder" of the said funds,[16] duly notified of competing claims to the funds and therefore obligated to mete the funds out with "reasoned discretion" (which it failed to do); Heller is allegedly liable on this theory by virtue of receiving the funds unreasonably paid out by the United States. [Pl.'s] Mem. in Resp. to the US' Mot. to Dismiss, at 15; Pl.'s Mem. in Opp'n to the Mot. to Dismiss of Def. Heller, at 15-16.

The Court must first consider whether it has subject matter jurisdiction over Plaintiff's claim against the United States (Count VII) – specifically, whether this equitable lien claim falls within the waiver of sovereign immunity codified in the SAA.  The Court then considers whether Counts VI and VII state valid claims under federal law.

### 1.   Jurisdiction Over the Government

As discussed above, the text of the SAA indicates a relatively broad waiver of immunity:  Essentially, where a case in admiralty may be brought against a private party, it may also be brought against the United States.  The SAA thus limits its sovereign immunity waiver in two ways:

---

[16]    *I.e.*, the US was a holder of funds in which it had no further interest.

1.    The suit against the United States must be "in admiralty"; and

2.    The plaintiff must be able to bring a similar admiralty action against a hypothetical private party in the Government's shoes.

An equitable lien claim, under the circumstances herein presented, is a claim "in admiralty."  Within the meaning of the SAA, "in admiralty" has been construed broadly to include claims arising out of the operation of government-owned vessels.  <u>E.g.</u>, <u>Johnson v. U.S. Shipping Bd. Emergency Fleet Corp.</u>, 280 U.S. 320, 326 (1930) (abrogated on other grounds).

Moreover, there is no suggestion that, had the owner of the RESOLUTE been a private entity, the subcontractor would be barred from suing the owner in federal court to assert an equitable lien.[17]  Such a claim, arising from a contract to repair a vessel, is an admiralty claim over which the federal courts have jurisdiction.[18]  1 <u>Benedict on Admiralty</u> § 184 at 12-15 and 12-16 (John C. Koster <u>et al.</u> eds. 7th ed. rev. 2003) (contracts to repair a vessel are "maritime contracts"); 28

---

[17]    This is, of course, not to say that such an equitable
lien claim would prevail against a private owner.

[18]    There is some dispute regarding the capacity of an admiralty court to grant IMIA the equitable relief it seeks (<u>compare In re The Eclipse</u>, 135 U.S. 599, 608 (1890) <u>with Pino v. Protection Mar. Ins. Co., Ltd.</u>, 599 F.2d 10, 16 (1st Cir. 1979)), but the Court need not reach such questions.  <u>See infra</u> Part III.C.2.

U.S.C. § 1333 (2003) ("[t]he district courts shall have
original jurisdiction... of... [a]ny civil case of admiralty
or maritime jurisdiction[]").

Therefore, the United States is deemed to have waived
immunity over the claim against it in Count VII.  The Court
has jurisdiction to adjudicate Count VII against the
Government.[19]

### 2.   The Merits of the Equitable Lien Claims

Counts VI and VII must be dismissed under Rule 12(b)(6).
Federal law does not (at least not in the manner asserted by
IMIA) empower subcontractors to challenge the manner in which
the United States performs its obligations under government
contracts.

Much of the case law cited by IMIA, interpreting
government contract provisions of the Miller Act (40 U.S.C. §§
270a-270f), empowers sureties of prime contractors, rather
than subcontractors generally, to bring equitable lien claims

---

[19]   Dep't of the Army v. Blue Fox, Inc., 525 U.S. 255
(1999) (jurisdiction was lacking, because the United States
did not waive immunity to an equitable lien claim) is
inapposite.  Blue Fox did not involve an admiralty claim or
the SAA.  Rather, the waiver of federal sovereign immunity
implicated in that case was the one contained in the
Administrative Procedure Act ("APA"), 5 U.S.C. § 702.  The APA
waiver is limited in ways the SAA waiver is not; notably the
APA allows suits only for non-monetary relief, and Blue Fox's
equitable lien claim was construed as, in essence, a claim
seeking monetary relief.  Blue Fox, 525 U.S. at 263.

against the United States.[20]  There are, undoubtedly, some
similarities between sureties and subcontractors such as IMIA
(which can be described as "operations subcontractors").[21]
Nevertheless, there is good reason for this Court, in
accordance with the case law and in the absence of explicit
and contrary Congressional instruction, to limit the power to
exert such equitable liens to sureties.

First, the Miller Act expressly contemplates prime
contractor suretyships and direct obligations running between
the government and these sureties.  40 U.S.C. § 270a (2003);
Balboa Ins. Co. v. United States, 775 F.2d 1158, 1160 (Fed.
Cir. 1985).  This is consistent with the general understanding
that sureties stand in the shoes of the principals to which

---

[20]    IMIA's cases include: Pearlman v. Reliance Ins. Co.,
317 U.S. 132, 141 (1962) (surety is entitled to government
funds); Balboa Ins. Co. v. United States, 775 F.2d 1158, 1160
(Fed. Cir. 1985) (interpreting Pearlman; government may be
liable to surety).  IMIA also cites several cases (e.g.,
Active Fire Sprikler Corp. v. United States Postal Serv., 811
F.2d 747 (2d Cir. 1987)) not precisely applicable hereto
because they address the specific and distinct rights of
entities that (sub-)contract with the US Postal Service.

[21]    Sureties are persons who agree to take on the debts,
contractual duties, or performance obligations of other
persons (the sureties' "principals").  Black's Law Dictionary
1455 (7th ed. 1999).  An "operations subcontractor," in
contrast, obligates itself to a prime contractor (which is
typically also a surety's principal) to undertake a
performance which happens to be part of, or related to, the
performance due from the prime contractor to the government.

21

they are bound.  See Peter A. Alces, The Law of Suretyship and Guaranty § 1:1 (2003).  By contrast, nothing in the Miller Act, or in any other pertinent provision of law, even suggests similar direct obligations running between the government and operations subcontractors.

Second, in assessing plaintiffs' capacities to enforce a lien against the United States, it is sensible to distinguish between sureties and operations subcontractors.  It is established that prime contractors (and/or their surrogates) generally may hold the federal government liable in contract, just as subcontractors may hold prime contractors liable. This typically ensures that every party involved in a public project has some recourse for contractual non-performance and that every party (including the United States) has an incentive to perform its obligations without exposing the Government to onerous and expansive liabilities.

If this Court were to hold the Government directly liable on a contract, not only to its prime contractor (and the prime's surrogates), but also to each of the subcontractors on any given project, this Court would considerably expand the Government's exposure to liability on Government contracts. Absent statutory direction, the Court declines to do so.

Plaintiff suggests that, because operations subcontractors benefit from the government performing its obligations to sureties,[22] subcontractors should have the same equitable lien rights as sureties.  Pl.'s Mem. in Opp'n to the Mot. to Dismiss of Def. Heller, at 16.  This is a <u>non sequitur</u>.  A surety stands in the place of a prime contractor; operations subcontractors are not parties to the prime contract, though they are likely affected by the government's performance on the prime contract.  A non-party to a contract, though affected by its performance, does not have the same rights as a party or the surrogate of a contracting party. <u>See, e.g.</u>, Restatement (Second) of Contracts § 302-15 (1981) (such non-contractors have rights, but not the same rights as contractors).

<u>Pearlman</u> and its progeny (<u>see supra</u> note 20) do not afford IMIA any substantive rights to assail the performance of the contract between the United States and BMI. Accordingly, under federal law, IMIA cannot impose an equitable lien against a party performing on that contract

---

[22]    <u>I.e.</u>, sureties, when compensated by the government under the prime contract, are able in turn to pay the subcontractors to whom the principal/ prime contractor is obligated.

(the United States) or against a party ultimately benefitting

from such performance (Heller).

     Accordingly, Counts VI and VII shall be dismissed.


V.    <u>CONCLUSION</u>

     For the foregoing reasons:

          1.   The United States' Motion to Dismiss [Paper 46]
               is GRANTED.

               a.   Counts I and VII of the Third Amended
                    Complaint (re maritime and equitable liens)
                    are DISMISSED WITH PREJUDICE.

          2.   The Motion by Defendant Heller Financial, Inc.
               to Dismiss the Third Amended Complaint [Paper
               51] is GRANTED IN PART AND DENIED IN PART.

               a.   Counts V and VI of the Third Amended
                    Complaint (re maritime and equitable liens)
                    are DISMISSED WITH PREJUDICE.

          3.   There remain pending Counts II, III and IV.[23]

          4.   By April 14, 2004, Plaintiff shall arrange a
               telephone conference to discuss the scheduling
               of further proceedings herein.

     SO ORDERED, on Tuesday, March 30, 2004.


                                _____/ s /_____
                                   Marvin J. Garbis
                             United States District Judge

_____

     [23]  Inasmuch as the United States is no longer a party,
the Court has diversity jurisdiction over the remaining
claims.